292 S.E.2d 54

**STATE ex rel. Jesse WHITE**

**v.**

**The Hon. Steven D. NARICK, Judge, etc., et al.**

**No. 15442.**

Supreme Court of Appeals of West Virginia.

June 3, 1982.

David R. Gold, Moundsville, L. Robert Pettini, Wheeling, for relator.

Joseph C. S. Cometti, Asst. Atty. Gen., Charleston, for respondents.

HARSHBARGER, Justice:

Jesse White is a murderer serving a life sentence without mercy in our State Penitentiary at Moundsville. He began a hunger strike on August 3, 1981, to protest conditions there, has lost in excess of 100 pounds, but has not suffered serious physical deterioration. Prison officials have announced that they will force-feed White to prevent his death; White has told us he would rather die for his cause than be fed.[1]

White's prayer for injunctive relief against force feeding was denied by Marshall County Circuit Court Judge Narick. He asked us for prohibition to accomplish the same result he wanted from Judge Narick. We consider this as a proceeding against the prison officials and not against Judge Narick.

The United States Supreme Court has stated that "no iron curtain [is] drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555–556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974). Prisoners retain

---

**1.** We note that in January, 1982, shortly after this case was argued, White voluntarily ended his fast. He now works as the prison's chief cook, having gained fifty pounds in the past four months. Charleston Gazette, May 4, 1982, at 1. However, per *Rissler v. Giardina*, 169 W.Va. 558, 289 S.E.2d 180 (1982), and cases cited therein, we decide this issue because it is capable of repetition.

the right to receive political publications, *Walker v. Blackwell,* 411 F.2d 23 (5th Cir. 1969), and to author political publications, *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971) (in banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); *Fortune Society v. McGinnis,* 319 F.Supp. 901 (S.D.N.Y.1970). Prisoners are protected from invidious race discrimination, *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); *Jones v. Diamond,* 636 F.2d 1364 (5th Cir. 1981). They retain their First Amendment right to pursue individual religions, *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Teterud v. Burns,* 522 F.2d 357 (8th Cir. 1975); and their right to engage in free political speech, subject to necessary security limitations, *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Prison officials cannot censor inmate speech "simply to eliminate unflattering or unwelcome opinions or factually incorrect statements," *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224, 240 (1974). Inmates can petition prison officials about grievances, *Stovall v. Bennett,* 471 F.Supp. 1286 (M.D.Ala.1979).

■ A prisoner is not entitled to all constitutional rights, *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356, 1369 (1948). The unique nature and requirements of prison custody allow a State to impose certain limitations on those rights. Thus, authorities can limit media access to a jail, *Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). Regulations prohibiting face-to-face interviews between prisoners and press have been upheld, *Pell v. Procunier, supra.* Rules allowing inmates to receive books and magazines from outside the institution only if they had been mailed directly by the publisher or a book club, have been validated, *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Similarly, rules preventing solicitation to join a prisoner's union, meetings of such a union, and delivery of union publications did not violate the First Amendment, *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Visitation privileges are not abso-

lutely or constitutionally required, *Underwood v. Loving,* 391 F.Supp. 1214 (W.D.Va. 1975), *modified,* 538 F.2d 325 (4th Cir. 1976). Transfer of federal prisoners to other prisons without a fact-finding hearing is permitted under the First and Sixth Amendments, *Curry-Bey v. Jackson,* 422 F.Supp. 926 (D.D.C.1976). Also correspondence between inmates can be restricted, but not eliminated, *Sostre v. McGinnis, supra.* See generally, Comment, *A Review of Prisoners' Rights Under the First, Fifth, and Eighth Amendments,* 18 Duquesne L.Rev. 683 (1980).

Only one state court has written about whether a hunger striking prisoner should be allowed to die. The Supreme Court of Georgia held that he should. *Zant v. Prevatte,* 248 Ga. 832, 286 S.E.2d 715 (1982). Prevatte began his fast to obtain transfer out of the Georgia prison system, believing that his life was in danger because of prior conflicts with other prisoners. The court, observing that Prevatte was mentally competent and had no dependents relying on him for support, affirmed a lower court's ruling and reasoning by quoting its opinion (to which we have added italicized comments):

A prisoner does not relinquish his constitutional right to privacy because of his status as a prisoner. *One could hardly conceive of a more drastic curb on privacy than being in prison.* The State has no right to monitor this man's physical condition against his will; neither does it have the right to feed him to prevent his death from starvation if that is his wish. *Could it immunize him against his will, to prevent spread of disease to other prisoners?*

The State argued in this proceeding that there is a compelling state interest in preserving any human life. The Court notes that Prevatte was at one time under a death sentence. To take the State's argument to its logical conclusion, were Prevatte still under a death sentence the State would ask the Court to allow it to keep him alive against his will so it could later kill him. *This argu-*

*ment fails if a state has no death penalty.*

Such approaches to legal questions point out the perils of the State becoming involved in deciding life or death issues. *One of its major tasks!* The State can incarcerate one who has violated the law and, in certain circumstances, even take his life. But it has no right to destroy a person's will by frustrating his attempt to die if necessary to make a point.... *Nothing could destroy a person's will more than death.* Under these circumstances, we hold that Prevatte, by virtue of his right of privacy, can refuse to allow intrusions on his person, even though calculated to preserve his life. The State has not shown such a compelling interest in preserving Prevatte's life, as would override his right to refuse medical treatment. (Footnote omitted.) *Zant v. Prevatte, supra* 286 S.E.2d, at 716–717.

We do not agree with *Zant.*

■ The Georgia court failed to consider compelling reasons for preserving life, not the least being civility. What sense does it make for a state to allow a prisoner to kill himself, urging as its justification his right-of-privacy right to refuse medical treatment for his voluntary debilitation; and yet preserve unto itself the right to kill him, the ultimate violation of his privacy right. We doubt that Georgia would allow him to raise his right of privacy against being put to death, as a defense against the death penalty!

*Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977), was a careful and thoughtful analysis by Justice Liacos about intervention by a state in a life-death decision by someone in its custody. Saikewicz, a severely mentally retarded resident of Belchertown, suffered from incurable myeloblastic monocytic leukemia. Chemo-

therapy was the accepted medical procedure; but its success rate was very low, its painful side effects were considerable, and its effect would be to extend Saikewicz' life only a short time. Affirming a probate court decision to allow Saikewicz not to be treated, the Court identified basic principles of state interest to be balanced against an individual's right to privacy: preservation of life and its converse, prevention of suicide; protection of interests of innocent third parties; and maintenance of physicians' ethical integrity (a matter with which we are not here involved). *Saikewicz, supra,* at 741, 370 N.E.2d, at 425.

*Commissioner of Correction v. Myers,* 379 Mass. 255, 399 N.E.2d 452 (1979), applied the same approach to lifesaving medical treatment of a prisoner. Myers refused to undergo hemodialysis, protesting against being in a medium security rather than a minimum security prison. *Id.,* 399 N.E.2d, at 454. Compelled treatment was deemed proper because of the strong state interest in orderly prison administration.

White contends that force-feeding would violate his right to control decisions about his body. The federal constitution has been interpreted to secure the right to privacy over one's body. *See, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Major decisions about this right deal with distinctly personal issues: rights of procreation and rights of death.[2] One noted Constitutional commentator observed:

Of all decisions a person makes about his or her body, the most profound and intimate relate to two sets of ultimate questions: first, whether, when, and how one's body is to become the vehicle for another human being's creation; second, when and how—this time there is no question of "whether"—one's body is to

2. *See, e.g., Roe v. Wade, supra* (right of a woman to decide to terminate her pregnancy before the fetus becomes viable); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (right of unmarried persons to obtain contraceptives); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)

(right of married couples to obtain contraceptives); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (no right to involuntarily sterilize person convicted at least twice of felonies involving moral turpitude; court recognized the right to reproduce as a "basic civil right").

terminate its organic life. L. Tribe, American Constitutional Law 921 (1978).

Competent, rational patients have been allowed to determine their fates by refusing medical treatment. *See, e.g., Satz v. Perlmutter*, 362 So.2d 160 (Fla.Dist.Ct. App.1978), *affirmed*, 379 So.2d 359 (1980) (patient suffering from fatal sclerotic disease and totally immobile, and dependent upon respirator); *Lane v. Candura*, 6 Mass.App. 377, 376 N.E.2d 1232, 93 A.L. R.3d 59 (1978) (77-year old patient refused to submit to amputation of gangrenous leg); *In re Quackenbush*, 156 N.J.Super. 282, 383 A.2d 785 (1978) (72-year old patient refused amputation of both gangrenous legs); *In re Melideo*, 88 Misc.2d 974, 390 N.Y.S.2d 523 (1976) (patient refused necessary blood transfusion); *In re Yetter*, 62 Pa.D.& C.2d 619 (1973) (patient refused cancer operation). Even when a patient is unable to will his fate, courts have permitted guardians to end medical treatment. *See e.g., Saikewicz, supra* (severely retarded 68-year old man suffering from fatal leukemia); *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, 79 A.L.R.3d 205, *cert. denied*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976) (22-year old woman in a permanent coma, dependent upon life-support machines and without any hope of recovery).[3]

A state must preserve human life, a concern at the very core of civilization.[4] But people cannot be forced to live through excruciating pain. We understand the Massachusetts regard for a right by those approaching certain, painful, uninvited death to terminate treatment, to get it "over with". We know that protestations for causes, however, are emotional commitments as various and unpredictable as the winds.[5]

West Virginia's interest in preserving life is superior to White's personal privacy (severely modified by his incarceration) and freedom of expression right. Our research indicates that although only one appellate court has dealt with death resulting from hunger strikes, they are common in prisons throughout the country.[6] Their main aim is to gain attention from prison officials and occasionally from the public, to manipulate the system. We cannot condemn fasting—Ghandi taught us about its force—as a way to secure change. But prison officials must do their best to preserve White's life.

White may petition for relief through established legal channels that in this State, at least, are readily available.[7]

Writ refused.

---

**3.** Prevention of suicide is a tenet of our society, but inroads are being made upon it by terminally ill patients who refuse medical treatment. *See* Byrn, *Compulsory Lifesaving Treatment for the Competent Adult*, 44 Fordham L.Rev. 1 (1975); Cantor, *A Patient's Decision to Decline Life-saving Medical Treatment: Bodily Integrity Versus the Preservation of Life*, 26 Rutgers L.Rev. 228 (1973); Richards, *Constitutional Privacy, The Right to Die and The Meaning of Life: A Moral Analysis*, 22 William and Mary L.Rev. 327 (1981).

**4.** *See* D. Morris, *The Naked Ape* (1967).

John Updike spoke through Harry Angstrom: "... Maybe I haven't done everything right in my life. I know I haven't. But I haven't committed the greatest sin. I haven't laid down and died.

"Who says that's the greatest sin?

"Everybody says it. The church, the government...." J. Updike, *Rabbit Is Rich* (1981), p. 381.

**5.** One might recall Bloom's fleeting thoughts during the instant between his initiation of his own destruction, and his death, in *From Here To Eternity*.

**6.** *See e.g., In the Matter of the Application of Martin H. Von Holden, as Director of the Central New York Psychiatric Center, for an Order Authorizing Forced Feeding on Mark David Chapman*, Index No. 82–463 (N.Y.Sup.Ct., Oneida County, February 26, 1982).

**7.** *See State ex rel. White v. Mohn*, W.Va., 283 S.E.2d 914 (1981), and *White v. Bordenkircher*, 169 W.Va. 239, 286 S.E.2d 686 (1982).

Also, there is presently litigation pending in Marshall County on over a dozen habeas corpus petitions, testing Moundsville prison conditions.