Merrimack
No. 84-246

*In re* JOEL CAULK

July 23, 1984

*Gregory H. Smith*, attorney general (*Ronald F. Rodgers*, assistant attorney general, on the brief and orally), for the State.

*Arpiar G. Saunders, Jr.*, of Concord, by brief and orally, for Joel Caulk.

BATCHELDER, J. The Superior Court (*DiClerico*, J.), on May 29, 1984, transferred without ruling the following question of law to this court:

"Does Joel Caulk, an inmate at the New Hampshire State Prison, have a constitutional right to die, without interference by the State, if he is mentally competent to make such a decision and if he has knowingly and voluntarily decided to die by starvation?"

For the reasons indicated below, we answer the question in the negative. Our analysis rests on the following facts found by the superior court.

Joel Caulk is a thirty-six-year-old prisoner in the New Hampshire State Prison serving a 10- to 20-year sentence for aggravated felonious sexual assault. A 5- to 10-year consecutive sentence for burglary will commence upon his completion of service of the 10–20 year sentence. Several charges are pending against the defendant in California upon which detainers and requests for temporary custody have been filed at the New Hampshire State Prison. The defendant has not been transferred to California because additional charges, filed against him in the Merrimack County Superior Court, remain to be dealt with prior to any disposition of the California indictments. Although a prison official testified that Massachusetts charges against the defendant had been dismissed, the defendant claims to be subject to a 20- to 30-year sentence in Massachusetts, to be served consecutively to his New Hampshire sentences. Nevertheless, it is probable that the defendant's various sentences and the pending indictments are tantamount to a sentence of life without parole.

The superior court found that, in light of his circumstances, the defendant stopped eating solid food on February 26, 1984. Since that time, he has been allowing himself to die slowly by refusing to consume any nourishment with the exception of certain liquids. He has purposely selected this method of dying so that he can remain competent. He wants to think, to feel and to understand his death. He

insists that he is not committing suicide but rather is allowing himself to die.

The defendant never expects to be released from prison again. He says he is tired, unhappy, and disappointed with the promise that life holds, and that he does not "belong on the streets." He maintains that if he cannot live freely, he does not want to live at all. While he is physically down, he claims that he is emotionally high.

The defendant does not claim to be a religious person in the formal sense, but suggests there is a spiritual dimension to him and to his actions. He admits that he has failed miserably to live a religious life. He testified that he has hurt a lot of people, and whenever he feels pain on his starvation diet, he believes he is paying another debt for his past misdeeds. In his words, he wants to leave the world as a man and to die with dignity, with his head up.

The defendant's course of conduct is calculated to achieve only one purpose; namely, his death. He is not making any demands or asking for anything in return for his fast. There is no evidence that he poses a direct threat to the security of the institution or to anybody in the institution. He is prepared to execute a release absolving the State and its officials from any civil liability if he is allowed to starve himself to death.

Because of the defendant's precarious physical condition brought about by his fasting, the trial court made the following order in response to the State's petition for preliminary injunction:

> "Pending further order of the Court, pursuant to RSA 622:7(1), the warden of the New Hampshire State Prison is authorized to feed and nourish Joel Caulk over his objection and to carry out all procedures deemed medically necessary to preserve Mr. Caulk's life and physical health, unless Mr. Caulk voluntarily consumes medically required nourishment . . . ."
> This order shall be effective forthwith."

■ The defendant claims that he has a constitutionally protected right to die without intervention by the State. He asserts rights to privacy, religious freedom, and freedom of speech, and the right to be free from cruel and unusual punishment under the State and Federal Constitutions. We conclude, based on the superior court's findings, that only the defendant's right to privacy is implicated. We note, however, that if factual support for implicating these other constitutional rights were present, the analysis would be the same.

■ We recognize that, under our State Constitution, "individuals have a constitutional right of privacy, arising from a high regard

for human dignity and self-determination, and that this right may be asserted to prevent unwanted infringements of bodily integrity . . . ." *Commissioner of Correction v. Myers*, 399 N.E.2d 452, 455–56 (Mass. 1979); N.H. CONST. pt. I, art's 2, 3. *Cf. Opinion of the Justices*, 123 N.H. 554, 559, 465 A.2d 484, 488 (1983) (mentally ill persons have a fundamental constitutional right to be free from unjustifiable intrusion upon personal security).

■ However, no constitutional right is absolute. *Id.* at 560, 465 A.2d at 489. The State may limit an individual's exercise of fundamental constitutional rights only when a compelling State interest is involved. *See Merrill v. City of Manchester*, 124 N.H. 8, 15, 466 A.2d 923, 928 (1983); *Belkner v. Preston*, 115 N.H. 14–15, 18, 332 A.2d 168, 170–71 (1975).

■ The defendant did not completely forfeit his State constitutional right to privacy by reason of his incarceration, but rather subjected himself to State interests unique to the prison. *Cf. Hudson v. Palmer*, 104 S.Ct. 3194 (1984) (prisoners have no federal constitutional expectation of privacy in their prison cells).

The State argues that the defendant's actions seriously undermine its obligation to maintain an effective criminal justice system with respect both to the investigation and prosecution of crimes and to the incarceration of convicted criminals. The State first points to the fact that there are presently pending two indictments against the defendant in New Hampshire, trials of which have had to be postponed because of the defendant's condition. Also, California has made a request for temporary custody of the defendant, in connection with criminal charges that have been lodged against him there. The State has an obligation to honor this request under the Interstate Agreement on Detainers, RSA chapter 606-A, but it has been unable to comply, again because of the defendant's condition.

■■ If the defendant is permitted to starve himself to the point where he cannot be tried in New Hampshire or California, he may effectively escape prosecution for these crimes and thereby frustrate the criminal justice system. The State's interest goes beyond seeking additional punishment of a defendant if he is guilty of the pending charges. It also has a duty to bring to finality pending investigations in such a way that the public knows that the criminal justice system has successfully responded to accusations of criminal behavior.

■ Within the State prison, the State's interests, among others, involve the preservation of internal order and discipline and the maintenance of institutional security. *See Bell v. Wolfish*, 441 U.S. 520, 546 (1979).

In connection with these interests, the State claims that the defendant has manipulated the system and disrupted the order of the prison. The defendant is classified as a maximum custody inmate, and instead of being housed in the maximum custody wing he must now be kept in the infirmary. Obviously, he is not consuming the diet chosen by the prison officials, but instead has made demands on these officials for a special liquid diet. The defendant testified that he allows prison officials to monitor his physical condition only if they permit him to see the test results.

■■ In addition to necessitating special treatment for himself, the defendant's actions have the potential of causing more widespread institutional problems. If the defendant is successful in evading the prison's control over his behavior, this may jeopardize prison discipline and tax prison resources. *See Commissioner of Correction v. Myers*, 399 N.E.2d at 459. We agree with the State that prison officials will lose much of their ability to enforce institutional order if any inmate can shield himself from the administration's control and authority by announcing that he is on a starvation diet. Prisoners are not permitted to live in accordance with their own desires, nor may they be permitted to die on their own terms without adversely and impermissibly affecting the State's legitimate authority over inmates. *See* Straffer, *Volunteering for Execution: Competency, Voluntariness and Propriety of Third Party Intervention*, 74 J. CRIM. L. & CRIMINOLOGY 860 (1983).

■ The defendant's simple wishes in this case also do not reflect the predicament which will be placed at the doorstep of prison personnel and the medical profession when and if he reaches the point of being alive yet comatose. During any period of the defendant's incompetence, prison personnel will be faced with the choice of honoring their constitutional and statutory duty to protect the life that lies precariously in their custody or of honoring a past request that in effect contravenes their legal obligations. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); RSA 622:7. Society should not force its servants to make such choices.

The State's interests in the preservation of human life and the prevention of suicide are also implicated in this situation.

For all practical purposes, the defendant, aside from the condition brought about by his fasting, is a healthy male inmate. He is not suffering from any terminal or life-threatening disease. He summed up his reasons for dying at the hearing on the State's petition for injunction:

> "To spend the rest of my life in prison is to spend the rest of my days on the fringes of life. . . . If I can't live fully, if I

*cannot be in the midst of life, if I no longer again have the opportunity to really live, and I have lived, I don't want to live at all. This world is no longer a good place for me. I'm not going to stay here any more."*

■ Although the defendant contends that he is allowing himself to die, rather than committing suicide, it is important to note what this case does not involve. This is not a situation where an individual, facing death from a terminal illness, chooses to avoid extraordinary and heroic measures to prolong his life, albeit for a short duration. Rather, the defendant has set the death-producing agent in motion with the specific intent of causing his own death, *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 743 n.11, 370 N.E.2d 417, 426 n.11 (1977), and any comparison of the two situations is superficial. *See Von Holden v. Chapman*, 87 A.D.2d 66, 70, 450 N.Y.S.2d 623, 627 (1982). Thus, in these circumstances, the State's interest in preserving life and preventing suicide dominates.

At common law, suicide was a felony; however, now, our Criminal Code does not proscribe it. *See* Mikell, *Is Suicide Murder?*, 3 COLUM. L. REV. 379 (1903); *see also* Byrn, *Compulsory Lifesaving Treatment for the Competent Adult*, 44 FORDHAM L. REV. 1, 16–17 (1975). Today in New Hampshire in the Criminal Code it is declared a crime to aid or abet the commission of suicide. RSA 630:4; *see also* RSA 627:6, VI. Additionally, the legislature has provided for involuntary commitment proceedings whenever an individual presents a potentially serious likelihood of danger to himself or herself. RSA 135-B:26.

■ We hold that in balancing this prisoner's right to privacy under the State Constitution with the State's interests in maintaining an effective criminal justice system and in preserving life, the State's interests must prevail. Additionally, we find that our conclusion based on the State Constitution offends none of the provisions of the Federal Constitution.

*Remanded.*

DOUGLAS, J., dissented; the others concurred.

DOUGLAS, J., dissenting: I disagree with the majority wherein it holds "that in balancing this prisoner's right to privacy under the State Constitution with the State's interests in maintaining an effective criminal justice system and in preserving life, the State's interest must prevail." I conclude that the State has not demonstrated a compelling interest so as to override Mr. Caulk's fundamental liberty right to fast until his natural death without governmental intervention. Our State motto proudly proclaims the choice to "live

free or die." If he can't do the former, I would permit the latter for Mr. Caulk.

The majority and I agree that it is highly likely that Mr. Caulk will serve the remainder of his natural life in prison. Mr. Caulk's decision to stop eating was made with full knowledge of all of the circumstances and consequences surrounding such a decision. The reasons for his decision to fast until his death are clear from his testimony:

> "I'm going to leave this world with dignity and with pride. There's another thing, and that's the pain. It hurts. I knew it was going to, but I've hurt a lot of people in my life, a lot of people. I've incurred a lot of debts I'm going to have to answer for. Every time I curl up or throw up or stand up and feel dizzy, even that's another debt paid."

The State contends that Joel Caulk is committing suicide. The trial court found that Joel Caulk "insists that he is not committing suicide but rather is allowing himself to die." Caulk testified:

> "Q. Would you describe what you're doing as suicide?
> A. Absolutely not. There is a qualitative difference between what I am doing and suicide. I am allowing myself to die. My life is over. As far as I'm concerned my life has ended, only the dying remains. It's not an overt act. I'm not killing myself. I'm allowing myself to be taken, its time."

Mr. Caulk contends that as a competent, informed adult and as a prisoner incarcerated within the State prison, he has a fundamental, constitutionally secured right to fast until his natural death without intrusion or intervention by the State. The State argues that it has compelling interests in maintaining Mr. Caulk's life that outweigh any rights he may have. I see no reason to force the employees of the State and our taxpayers to expend time and money keeping this convict alive, provided certain procedural protections are effectuated.

The majority and I agree that, as stated by our sister State court in Massachusetts, "under our State Constitution, 'individuals have a constitutional right of privacy arising from a high regard for human dignity and self-determination, and that this right may be asserted to prevent unwanted infringement of bodily integrity.'" *Commissioner of Correction v. Myers*, 399 N.E.2d 452, 455–56 (Mass. 1979); N.H. CONST. pt. I, art's 2, 3. I also agree with the court that "[t]he defendant did not completely forfeit his State constitutional right to privacy by reason of his incarceration." Our State Constitu-

tion does not stop at our institutional doors. We opined, in an opinion involving forced medication at the State Hospital, that "mentally ill persons have a right to be free from unjustified intrusion upon their personal security." *Opinion of the Justices*, 123 N.H. 554, 559, 465 A.2d 484, 488 (1983). We stated that the right "to refuse medical treatment is a liberty interest which is protected by our State Constitution." *Id.* at 560, 465 A.2d at 489. The same holds true for prison inmates.

Privacy and bodily integrity in one's person vis-à-vis the government is certainly at the core of our concept of liberty. In *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), Justice Brandeis stated: "[The makers of our Constitution] conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."

The State asserts, and the majority concludes, that the State's interests in maintaining an effective criminal justice system and in preserving life outweigh Mr. Caulk's constitutional right to privacy. I join the Supreme Court of Georgia in *Zant v. Prevatte*, 248 Ga. 832, 286 S.E.2d 715 (1982) and conclude that the nature and the limits of the asserted governmental interests are such that Mr. Caulk's fundamental right to privacy may not be infringed.

At the outset, it is worth noting that this case, unlike prisoner hunger strike cases decided in other jurisdictions, is not one in which the "main aim is to gain attention from prison officials and occasionally from the public, to manipulate the system." *State ex rel. White v. Narick*, 292 S.E.2d 54, 58 (W. Va. 1982) (hunger strike to protest prison conditions); *see In re Sanchez*, 577 F. Supp. 7 (S.D.N.Y. 1983) (hunger strike to pressure judge to vacate contempt order). Rather, as the superior court found, Mr. Caulk's "course of conduct is calculated to achieve only one purpose, namely his death."

The majority speculates as to what might come to pass if Mr. Caulk is permitted to exercise his liberty right. It then concludes that Mr. Caulk's actions could cause a breakdown in prison discipline, would disable the prison's ability to enforce institutional order and would adversely affect the State's authority over inmates. This conclusion simply is not supported by either the record or the superior court's findings.

As stated above, the *State* has the burden of proving that its institutional concerns are compelling and outweigh Mr. Caulk's constitutionally protected rights. Based upon the evidence the State presented below, the trier of fact found that "[Mr. Caulk] is not making any demands on prison officials. There is no evidence that he poses a threat to the security of the institution or to anybody in the institu-

tion." After a careful review of the record, I sustain the trier's findings and conclude that the institutional concerns asserted by the State and accepted by the majority are not borne out by the record and, thus, do not override the exercise of Mr. Caulk's constitutionally protected liberty right.

Moreover, the State's argument that, if the defendant is permitted to exercise his constitutional right, he will frustrate the aims of effective criminal justice, is without merit. Essentially, the State claims that it should be allowed to keep Mr. Caulk alive so that it may subject him to further prosecution and punishment. Any abstract interest the majority holds that the State has in assuring that the public knows that the criminal justice system has successfully responded to accusations of criminal behavior, certainly could not outweigh the fundamental liberty interest at stake in the case before us.

The magnitude of the proposed governmental intrusion must be considered in any balancing of the State's interest with an individual's right to privacy. *See Commissioner of Correction v. Myers*, 399 N.E.2d 452, 457 (Mass. 1979). In the instant case, the proposed magnitude of the governmental invasion of bodily integrity is significant. In fact, it would be difficult to imagine a greater intrusion upon one's right to bodily integrity and self-determination than force-feeding. Not only does it present significant health risks and subject the individual to a high degree of pain; if the individual refuses to eat voluntarily after force-feeding has been ordered, the painful daily ordeal may continue indefinitely.

At trial, Dr. Klinger, a part-time physician at the New Hampshire State Prison, testified, when asked how Mr. Caulk would be force-fed if it became necessary to do so: "[T]he best way to do it would be to use a nasogastric tube . . . a small rubber tube passed down through the nasal passages into the stomach . . . ." He further testified that the insertion of the tube has to be done very carefully, because gagging often occurs and that novocaine is normally applied to the tube to ease the pain of insertion.

Mr. Caulk states in his brief that nasogastric tube-feeding began on June 1, 1984, in accordance with the May 25, 1984, preliminary order of the superior court. No novocaine was used during the insertion of the tube. He suffered a great deal of pain and discomfort as a result of the constant irritation of the tube on his throat and nasal passages. His efforts to resist the painful swallowing reflex caused him to suffer severe headaches. The tube was removed due to the danger of imminent ulceration of his throat and nasal passages. Given Mr. Caulk's position that despite the outcome of this appeal, he is not going to eat voluntarily, it is reasonable to conclude that

painful government-controlled force-feeding in the manner set out above may continue indefinitely.

The majority's reliance on the fact that Mr. Caulk is not facing death from a terminal illness ignores the non-physical quality of life and reduces the quality of life to mere *physical* well-being. Mr. Caulk testified: "Right now physically I'm down but that was intended. Emotionally, spiritually, I feel good. I like what I'm doing and I'm proud. I don't want to lose that. I don't want to be defeated." While the significant physical invasion of force-feeding will keep Mr. Caulk's heart beating, the prognosis for his personal well-being as a result of the majority's holding is as poor, if not poorer, than it was before he chose to exercise his fundamental, constitutionally secured liberty right.

An individual must be free from governmental intrusion, save for the protection of society. In his work *On Liberty*, one of the finest minds of the 18th century, John Stuart Mill, set forth the nature and limits of authority that can be legitimately exercised by society over the individual. He wrote:

> "[T]he only purpose for which power can be rightfully exercised over any member of a civilised community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinion of others, to do so would be wise, or even right."

Mill, *On Liberty*, in 43 GREAT BOOKS OF THE WESTERN WORLD 271 (R. Hutchins ed. 1952). This notion of liberty lies at the very foundation of our society, and is the cornerstone of our constitutional concept of individual rights.

In the instant case, Mr. Caulk, in an expression of his dignity, personal autonomy and self-determination, stated: "I am simply stating let me be." This liberty right clearly may not be interfered with under the guise of a public interest because the State's interest in the preservation of life does not extend to Mr. Caulk's personal choice and fundamental right to be left alone, a right which does not involve harm to others, either directly or indirectly.

When the State interferes with an individual's right to act in a way which affects only his own personal well-being, it not only denies that individual's basic liberty, but it menaces the liberty of all individuals and threatens the very principles upon which our society is based. "Mankind are greater gainers by suffering each

other to live as seems good to themselves, than by compelling each to live as seems good to the rest." Mill, *supra* at 273.

We are all, however, concerned that prisoners not be starved against their will and that due process be fully accorded. I would, therefore, require that any prisoner seeking to avoid force-feeding must petition the institution for a hearing before a neutral official to determine (1) that the prisoner has no condition or demand he is seeking to extract or manipulate from corrections personnel in return for his not fasting; (2) that he is competent and is voluntarily and knowingly entering into his fast with an understanding of the consequences; (3) that he has been examined by a physician who has explained to him the physical phases and reactions his body will endure (informed consent); (4) that he executes a voluntary release of all civil or criminal liability (including any claim under 42 U.S.C. § 1983) to the employees and government confining him; (5) that he waive appointment of any guardian seeking to exercise "substituted judgment" for him when he deteriorates to the point of mental incompetency; and (6) that he agree that the authorities will neither aid nor assist him in any way by medical attention; in other words, he must die truly unassisted by the government.

If all these conditions are met, then a prisoner may avoid force-feeding or intervention by agents of the government. If either the institution or the prisoner disagrees with the result of the hearing, it or he may seek relief (as here occurred) in the superior court.

If these conditions are met, the State is not aiding or abetting a suicide; it is merely leaving an individual alone to speed the natural and inevitable part of life known as death. *See* RSA 630:4, I. It must be pointed out that the act Mr. Caulk is committing is legal, even if it arguably can be called a suicide, because suicide is no longer a crime in New Hampshire. The State is not being manipulated in such instances as it may be if political or private demands are being sought by a hunger strike. Finally, this prisoner, unlike in the abortion context, is dealing with only his body, soul and consciousness, rather than with that of another person. *See Wallace v. Wallace*, 120 N.H. 675, 684–85, 421 A.2d 134, 140 (1980) (Douglas, J., dissenting).

This case is difficult for all of us to resolve. Under the Constitution of New Hampshire, I must respect Mr. Caulk's right to be free from governmental intrusion of his bodily integrity even though I might disagree with his position or the morality of it.