THE PEOPLE *ex rel.* THE DEPARTMENT OF CORRECTIONS, Plaintiff-Appellee, v. ELDON MILLARD, Defendant-Appellant.

Fourth District   Nos. 4—01—0857, 4—01—0953 cons.

Argued October 23, 2002.—Opinion filed January 8, 2003.

KNECHT, J., dissenting.

Robert M. Travers (argued), of Fellheimer Law Firm, Ltd., of Pontiac, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and A. Benjamin Goldgar (argued), Assistant Attorney General, of counsel), for appellee.

JUSTICE APPLETON delivered the opinion of the court:

On or about June 17, 2001, defendant, Eldon Millard, an inmate at Pontiac Correctional Center (Pontiac), declared a hunger strike to protest his transfer from East Moline Correctional Center (East Moline). The Illinois Department of Corrections (Department) filed a complaint for injunctive relief seeking authority to use reasonable and necessary force to administer medical treatment and nutrition to defendant.

On September 10, 2001, after hearing evidence and argument of counsel, the trial court entered an order authorizing the Department to force-feed defendant through the use of intravenous injections, a nasogastric tube, or a jejunostomy tube. On September 27, 2001, the trial court entered an amended order also authorizing the Department to force-feed defendant through the surgical implantation of a percu-

taneous endoscopic gastrostomy (PEG) tube. Defendant appeals, arguing his right to refuse nourishment outweighs the Department's interests in preserving life, preventing suicide, and maintaining the orderly prison administration. We affirm.

## I. BACKGROUND

We review the testimony only to the extent necessary to put defendant's argument in context. According to the testimony, defendant began serving a three-year sentence for stalking on March 17, 1999. In October 2000, defendant was given one year's mandatory supervised release. In December 2000, he violated the terms of his release and was returned to prison to serve the remainder of his original sentence. Upon his return, defendant was placed in East Moline, a minimum-security facility. There, he was housed in the health-care unit due to his numerous health problems, including obesity, coronary artery disease, hypertension, asthma, degenerative arthritis, and obstructive sleep apnea.

In January 2001, defendant was transferred to Pontiac for medical reasons. Defendant had a tracheostomy tube, which, according to the manufacturer's recommendation, was scheduled to be replaced. A surgeon in Joliet, Illinois, was trained to perform such replacements, and Pontiac was closer to the scheduled surgery site than East Moline. At Pontiac, defendant was also housed in the health-care unit; however, Pontiac is a maximum-security facility where inmates have considerably fewer privileges. Within a few weeks of his transfer to Pontiac, defendant became obstinate, insulting, and threatening. He refused all medical care. He was evaluated twice by a psychiatrist, who determined that defendant was competent to refuse medical treatment.

In February and March 2001, defendant was disciplined for refusing orders and for engaging in threatening and intimidating behavior. Defendant was placed in segregation within the health-care unit and lost his good-time credit, giving him a new discharge date of February 16, 2002.

Beginning approximately June 17, 2001, defendant began a hunger strike (1) protesting his transfer to Pontiac, (2) objecting to having his tracheostomy tube replaced while in the Department's custody, and (3) claiming he was being wrongfully detained beyond his discharge date. He vowed to continue his hunger strike until he (1) was sent back to East Moline, (2) was released from prison, or (3) died.

On July 13, 2001, the Department filed an emergency motion for a temporary restraining order and preliminary injunction requesting authority to use reasonable and necessary force to monitor defendant's

health and, if necessary, to administer life-essential nutrition. The trial court entered a temporary order requiring defendant submit to one blood draw, one electrocardiogram, and a check of his vital signs. The Department was not granted any further authorization.

On July 17, 2001, the trial court heard testimony and argument on the Department's motion for preliminary injunction and subsequently entered an order authorizing the Department to monitor defendant's health condition and, if necessary, to administer nutrition through intravenous and nasogastric tubes. On September 6, 2001, the Department filed a complaint for permanent injunctive relief and the trial court conducted an evidentiary hearing. After two days of testimony, the trial court entered an order finding the Department's interests in preserving life, preventing suicide, and maintaining the orderly administration of its correctional institutions outweighed defendant's right to privacy. The trial court authorized the Department to monitor defendant's health and to administer nutrition intravenously or through the use of nasogastric or jejunostomy tubes. Defendant appealed, docket No. 4—01—0857.

On September 21, 2001, the Department requested the trial court amend its order to include the use of a PEG tube, a less-invasive approach, to administer nutrition to defendant. The trial court heard testimony from the Department's physician, who explained the procedure and benefits of the PEG tube. On September 27, 2001, the trial court amended its order to include the use of a PEG tube. Defendant appealed, docket No. 4—01—0953. We consolidated the appeals.

## II. ANALYSIS

During the pendency of this appeal, defendant was released from prison. As of his release, it was no longer the Department's responsibility to provide medical care or nutrition to defendant, thereby rendering his claim moot. When events have occurred that make it impossible for the reviewing court to render effectual relief, a case is rendered moot. *Marion Hospital Corp. v. Illinois Health Facilities Planning Board*, 201 Ill. 2d 465, 471, 777 N.E.2d 924, 927 (2002).

■ Despite the mootness of defendant's appeal, both parties ask that we retain jurisdiction and decide the legal issues presented pursuant to the public interest exception to the mootness doctrine. The criteria to invoke the public interest exception are (1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will generally recur. *Johnson v. Edgar*, 176 Ill. 2d 499, 513, 680 N.E.2d 1372, 1378 (1997).

■ We agree with the parties that the issue in this case falls within the public interest exception. The issue of whether the Department must force-feed a starving inmate against his will or allow the inmate to starve to death while committed to the Department is a matter of public importance. Further, this is a case of first impression in Illinois and the Department is in need of guidance. Finally, the issue of the Department's role during an inmate's hunger strike is likely to recur. Thus, we will decide the case on the merits and remove the uncertainty of the Department's role in similar situations.

This is a matter of weighing the Department's interest against defendant's or other inmates' constitutional rights. Constitutional questions, like other questions of law, are reviewed *de novo*. *Quantum Pipeline Co. v. Illinois Commerce Comm'n*, 304 Ill. App. 3d 310, 314, 709 N.E.2d 950, 953 (1999).

In reviewing the trial court's force-feeding order of September 27, 2001, we, like the majority of courts that have considered the question, hold that such an order does not violate a hunger-striking prisoner's constitutional rights. See, *e.g.*, *In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001); *In re Grand Jury Subpoena John Doe*, 150 F.3d 170 (2d Cir. 1998); *State ex rel. Schuetzle v. Vogel*, 537 N.W.2d 358 (N.D. 1995); *Commonwealth v. Kallinger*, 134 Pa. Commw. 415, 580 A.2d 887 (1990); *In re Caulk*, 125 N.H. 226, 480 A.2d 93 (1984); *State ex rel. White v. Narick*, 170 W. Va. 195, 292 S.E.2d 54 (1982); *In re Von Holden*, 87 A.D.2d 66, 450 N.Y.S.2d 623 (1982).

■ Finding that the difficulties of prison administration warrant special consideration, the United States Supreme Court articulated a standard of review for prisoners' constitutional claims that is responsive both to the " 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.' " *Turner v. Safley*, 482 U.S. 78, 85, 96 L. Ed. 2d 64, 76, 107 S. Ct. 2254, 2259, (1987), *Procunier v. Martinez*, 416 U.S. 396, 406, 40 L. Ed. 2d 224, 236, 94 S. Ct. 1800, 1808 (1974). When a prison regulation impinges on an inmate's constitutional right, the regulation is valid if it is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89, 96 L. Ed. 2d at 79, 107 S. Ct. at 2261. This differs from the strict standards of scrutiny applicable to the constitutional rights of persons in a free society.

Defendant does not assert that his hunger strike is an expression of his first amendment right to free speech and/or religion. It would appear defendant's main purpose in refusing nutrients was to manipulate the system. Defendant claims that forcing him to take in nutrients is a violation of his right to privacy.

In *Soliman*, the court addressed the Immigration and Naturaliza-

tion Service's authority to force-feed a hunger-striking detainee who alleged his right to privacy in objecting to the forced-feeding. The *Soliman* court stated:

> " 'Although the United States Constitution does not specifically mention a right to privacy, the Supreme Court has recently recognized it as an independent constitutional right. The Court has grounded the right on at least three sources: common[-]law rights, emanations from specific constitutional provisions, and the general requirements of "liberty" underlying the Constitution.' " *Soliman*, 134 F. Supp. at 1254, quoting S. Bennett, *The Privacy & Procedural Due Process Rights of Hunger Striking Prisoners*, 58 N.Y.U. L. Rev. 1157, 1165 (1983).

Although forced-feeding may violate an inmate's right to privacy, that right is outweighed by the Department's interests in the administration of our penal system. We agree with several state-court decisions that upheld the right to force-feed hunger-striking prisoners.

For example, in *White*, a convicted murderer began a hunger strike to protest the conditions at the prison. The West Virginia Supreme Court recognized that the federal constitution has been interpreted to secure the right to privacy over one's body and that competent patients have been allowed to refuse medical treatment. The court held, nevertheless, that:

> "West Virginia's interest in preserving life is superior to White's personal privacy (severely modified by his incarceration) and freedom of expression right. Our research indicates that although only one appellate court has dealt with death resulting from hunger strikes, they are common in prisons throughout the country. Their main aim is to gain attention from prison officials and occasionally from the public, to manipulate the system. We cannot condemn fasting—Ghandi [*sic*] taught us about its force—as a way to secure change. But prison officials must do their best to preserve White's life." *White*, 170 W. Va. at 199, 292 S.E.2d at 58.

In *Caulk*, the New Hampshire Supreme Court determined that a prison inmate had no constitutional right to starve himself to death even though the decision to do so was made knowingly and voluntarily. After noting that the inmate enjoyed a constitutional right to privacy, the court concluded that the state interest in the maintenance of institutional security was implicated:

> "In addition to necessitating special treatment for himself, the defendant's actions have the potential of causing more widespread institutional problems. If the defendant is successful in evading the prison's control over his behavior, this may jeopardize prison discipline and tax prison resources. [Citation.] We agree with the [s]tate that prison officials will lose much of their ability to enforce

institutional order if any inmate can shield himself from the administration's control and authority by announcing that he is on a starvation diet. Prisoners are not permitted to live in accordance with their own desires, nor may they be permitted to die on their own terms without adversely and impermissibly affecting the [s]tate's legitimate authority over inmates." *Caulk*, 125 N.H. at 231, 480 A.2d at 96.

In *Caulk*, the court concluded that the state's interests in preserving life, preventing suicide, and maintaining an effective criminal justice system outweighed the prisoner's right to privacy. *Caulk*, 125 N.H. at 232, 480 A.2d at 97. Similarly in *Kallinger*, the court determined that an inmate did not have the right to starve himself to death.

"The Commonwealth has an overwhelming interest in maintaining prison security, order[,] and discipline. \*\*\*

Prison officials are given a wide range of discretion in the promulgation and enforcement of rules to govern the prison community in order to maintain security, order and discipline. [Citations.] \*\*\*

\* \* \*

In the present case, the uncontradicted testimony shows that if Kallinger would be permitted to die, other patients at Farview [State Hospital] would almost certainly copy the same tactic, manipulating the system to get a change of conditions, possibly resulting in their death. [Citation.] Allowing a prisoner to die will cause other patients to become angry and lose faith in the system and make treatment more difficult; it may even spawn rioting at Farview or from prisoners at Huntingdon or other state institutions. [Citation.] It is clear that allowing a prisoner to starve to death while in state custody would have an unpredictable negative effect on the security and order within the prison system." *Kallinger*, 134 Pa. Commw. at 421-22, 580 A.2d at 890-91.

The court also implicated the integrity of the medical profession and found that it must be factored into the balancing equation. The court concluded:

"The Commonwealth of Pennsylvania has an overwhelming interest in the orderly administration of its prison system. The Commonwealth must maintain prison security, order[,] and discipline. It must also fulfill its duty to provide proper medical care to the inmates, thus preserving life and preventing suicide. These vital interests, along with the need to preserve the integrity of the physicians and psychiatrists working within the penal system, clearly outweigh any diminished right to privacy held by Kallinger." *Kallinger*, 134 Pa. Commw. at 426, 580 A.2d at 893.

In contrast to the above cases is the Georgia case of *Zant v. Prevatte*, 248 Ga. 832, 286 S.E.2d 715 (1982). In *Zant*, the inmate decided to engage in a hunger strike to get the attention of the prison officials. The lower court determined that the state had no right to interfere with the inmate's hunger strike:

> "The [s]tate has no right to monitor this man's physical condition against his will; neither does it have the right to feed him to prevent his death from starvation if that is his wish.
>
> \*\*\*
>
> \*\*\* The [s]tate can incarcerate one who has violated the law and, in certain circumstances, even take his life. But it has no right to destroy a person's will by frustrating his attempt to die if necessary to make a point." *Zant*, 248 Ga. at 834, 286 S.E.2d at 716-17.

The Georgia Supreme Court affirmed the lower court's decision disallowing state interference, stating:

> "Prevatte is not mentally incompetent, nor does he have dependents who rely on him for a means of livelihood. The issue of religious freedom is not present. Under these circumstances, we hold that Prevatte, by virtue of his right of privacy, can refuse to allow intrusions on his person, even though calculated to preserve his life. The [s]tate has not shown such a compelling interest in preserving Prevatte's life, as would override his right to refuse medical treatment." *Zant*, 248 Ga. at 834, 286 S.E.2d at 717.

We do not agree with *Zant*. The Georgia court failed to consider compelling penological objectives such as the preservation of life, prevention of suicide, and the enforcement of prison security, order, and discipline. We not only acknowledge those interests of the Department, but hold that they are superior to the constitutional rights asserted by defendant in this case.

■ Defendant was not on a hunger strike as a means of demonstrating on behalf of some political cause or religious belief. His "cause," as is most commonly the case in hunger-strike situations in prison, was to manipulate the system, to gain the attention of prison officials with the hope of making his confinement easier. We do not condone such manipulative behavior in our prison system. At the same time, however, we respect an individual's right to privacy and the right to control one's own body. See *Thor v. Superior Court*, 5 Cal. 4th 725, 734-38, 855 P.2d 375, 380-83, 21 Cal. Rptr. 2d 357, 362-65 (1993) (a person's interest in personal autonomy and self-determination is a fundamentally commanding one, with well-established legal and philosophical underpinnings). While in the Department's custody, however, an inmate's right to privacy must be balanced against the Department's interest in maintaining an orderly and disciplined institution. Because the Department's interest in prison administra-

tion is the controlling factor here, we hold that the Department may force-feed a hunger-striking inmate, whose only purpose is to attempt to manipulate the system so as to avoid disruptive or otherwise detrimental effects to the orderly administration of our prison system.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's order authorizing the Department to monitor defendant's health and, if necessary, forcefully administer life-sustaining nutrition.

Affirmed.

COOK, J., concurs.

JUSTICE KNECHT, dissenting:

I respectfully dissent. I agree with the holdings in *Zant v. Prevatte*, 248 Ga. 832, 286 S.E.2d 715, and *Thor v. Superior Court*, 5 Cal. 4th 725, 855 P.2d 375, 21 Cal. Rptr. 2d 357. Eldon Millard is competent to refuse medical treatment or medication. He does not wish to commit suicide, but he is willing to die. His hunger strike is a protest against prison conditions and his transfer to Pontiac. His protest does not extend to prison conditions in general, nor does he seek to enlist other inmates in a cause.

The State presented no evidence showing his conduct had disrupted the prison or raised security issues. No evidence was presented other inmates sympathize with him or are themselves prepared to go on a hunger strike in response to his conduct. No anecdotal evidence was presented as to what has occurred in other institutions after a hunger strike or a death by hunger strike so even an inference could be drawn as to what might occur.

The Department simply asserts we need to forcibly feed Millard to keep him alive. We need to do so with a nasogastric tube, and then— because this is a temporary solution—we need to surgically insert a tube into his stomach. To maintain an orderly and disciplined institution, we want to do these things against his expressed wishes.

I agree an inmate's right to privacy must be balanced against the Department's interest in maintaining order, security, and discipline. What is missing in this record is any evidence that Millard's conduct has had, or will have, *any* effect on order, security, or discipline. There is no balancing to be done. Millard has carefully expressed his will. We need not like him or the reasons for his hunger strike, but if the government wants to ram a tube down his throat or cut a hole in his abdomen, it should be required to demonstrate a compelling reason for doing so.

Millard cannot travel or work where he pleases. He cannot take a walk or enjoy unlimited access to earth and sky. He forfeited liberty when he was convicted of a crime. He does not deserve unfettered freedom—but the right to refuse medical treatment continues to reside with him. I believe this right encompasses refusing nourishment. The right to die—if he chooses to do so quietly and without disruption—is a civil liberty he retains. It is a liberty that belongs to him. If the government wishes to take that liberty from him, it must explain and persuade. It cannot just speculate that something bad may happen.