[No. 23310-3-III.   Division Three.   June 2, 2005.]

CHARLES R. McNABB, *Appellant*, V. THE DEPARTMENT OF
CORRECTIONS ET AL., *Respondents*.

*John D. Blair-Loy* and *Terri D. Sloyer*, for appellant.

*Robert M. McKenna, Attorney General*, and *Mary Mc-Lachlan, Assistant*, for respondents.

¶1 KATO, C.J. — Charles McNabb sued the Department of Corrections (DOC) to invalidate its force-feeding policy as unconstitutional, illegal, and invalid and to enjoin it from force-feeding him. The court denied his motion for preliminary injunction and summary judgment and granted summary judgment for DOC. Contending he has the constitutional right to refuse to be force-fed, he appeals. We affirm.

¶2 Mr. McNabb is an inmate at the Airway Heights Corrections Center. Before his arrival at the prison on July 12, 2004, he had not eaten voluntarily for five months. Within two days of arriving at the prison, the medical staff inserted a tube into his nose and stomach to force-feed him.[1] Mr. McNabb was force-fed for several days, until he agreed to eat on his own to avoid further force-feeding.

¶3 On August 4, 2004, Mr. McNabb moved for declaratory judgment and injunctive relief, claiming DOC's force-feeding policy violated his constitutional right to privacy, including the right to refuse artificial means of nutrition and hydration under article I, section 7 of the Washington Constitution and his common law right to be free from bodily invasion. The court denied his motion and entered summary judgment for DOC. This appeal follows.

¶4 Mr. McNabb contends DOC's force-feeding policy violates his right to privacy under article I, section 7 of our state constitution, which states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Both Mr. McNabb and DOC analyze the issue using the factors in *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

---

[1] DOC policy provides that "[o]ffenders in total confinement shall be provided with the nutrition necessary to preserve their health and life" and allows an offender to be force-fed if efforts to encourage the inmate to eat voluntarily are not successful and/or if the offender's medical condition indicates serious deterioration in his or her health. Clerk's Papers at 22.

¶5 The starting point for determining whether our constitution must be interpreted more broadly than the federal constitution in a given context requires an analysis of the *Gunwall* factors. The following criteria are relevant to this determination: "(1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern." *Id.* In previous article I, section 7 challenges, our Supreme Court has simply adopted the *Gunwall* court's analysis of the first, second, third, and fifth factors because they do not vary from case to case. *State v. Boland*, 115 Wn.2d 571, 576, 800 P.2d 1112 (1990). We will therefore look to only the fourth and sixth *Gunwall* factors.

¶6 The sixth *Gunwall* factor examines whether the issue is one of state or local concern. "This factor is relevant because our courts are willing to sacrifice national uniformity for greater protection for our citizens where significant privacy concerns are at stake." *State v. Audley*, 77 Wn. App. 897, 903, 894 P.2d 1359 (1995). But the privacy interest involved here does not involve a subject matter for which national uniformity is necessary. *See State v. Silva*, 107 Wn. App. 605, 621, 27 P.3d 663 (2001) (stating the State's interest in law enforcement and Washington citizens' privacy interests are matters of state interest or local concern). Thus, the authority to force-feed a prison inmate is a concern that is particularly local in character. The sixth *Gunwall* factor is met.

¶7 But the determinative factor here is the fourth *Gunwall* factor, preexisting state law. This focuses on the degree of privacy protection Washington has historically afforded to individuals in similar situations. *See Gunwall*, 106 Wn.2d at 61-62, 66. Although Washington courts have consistently held article I, section 7 may provide greater protection against warrantless searches and seizures than

the Fourth Amendment,[2] " '[a] determination that a given state constitutional provision affords enhanced protection in a particular context does not necessarily mandate such a result in a different context.' " *State v. McKinney*, 148 Wn.2d 20, 26, 60 P.3d 46 (2002) (alteration in original) (quoting *State v. Johnson*, 128 Wn.2d 431, 446, 909 P.2d 293 (1996)).

¶8 Relying on cases dealing with the informed consent doctrine, Mr. McNabb argues Washington law prohibits unconsented invasions of the body, even if for the alleged benefit of the person. He also relies on *In re Guardianship of Grant*, 109 Wn.2d 545, 747 P.2d 445 (1987), as supporting his claim that he has the constitutional privacy right to refuse artificial means of nutrition and hydration. But these cases do not show that greater protection is extended to prisoners under article I, section 7 than under the Fourth Amendment. Indeed, Mr. McNabb cites no cases analyzing a prisoner's expectation of privacy under the Washington Constitution. Because "preexisting state law" is a broad inquiry, *see Robinson v. City of Seattle*, 102 Wn. App. 795, 810, 10 P.3d 452 (2000), the extent to which Washington law has protected the privacy of prison inmates is also relevant to our review of the fourth *Gunwall* factor.

¶9 Washington courts have determined inmates have a lowered expectation of privacy while in custody. *State v. Rainford*, 86 Wn. App. 431, 438, 936 P.2d 1210, *review denied*, 133 Wn.2d 1019 (1997); *Audley*, 77 Wn. App. at 904 (stating that the Washington Constitution affords no greater protection to an arrestee from warrantless bodily searches than the federal constitution); *State v. Baker*, 28 Wn. App. 423, 424-25, 623 P.2d 1172 (1981) (allowing routine pat-down searches of prisoners even without articulable suspicion). A diminished right to privacy even

---

[2] The fourth amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

extends to probationers and parolees. *Rainford*, 86 Wn. App. at 438.

¶10 Although the privacy provision of our state constitution is largely concerned with protecting citizens from unreasonable searches and seizures, no case has suggested that article I, section 7 was intended to afford greater privacy protection to prison inmates than the federal constitution. Thus, we hold there is no basis to conclude that DOC's force-feeding policy violates article I, section 7 of our state constitution.

¶11 In any event, our Supreme Court has already recognized that the right to withhold life sustaining treatment, including the right to withhold nasogastric tubes, intravenous feeding and other artificial means of nutrition and hydration, stems independently from the explicit privacy guaranty in article I, section 7 of the Washington Constitution, *see Grant*, 109 Wn.2d at 553 n.1, 565. But it does not support Mr. McNabb's claim that DOC's force-feeding policy also violates his right to privacy. The right to decline force-feeding is not absolute because the State has an interest in protecting the sanctity of the lives of its citizens. *In re Welfare of Colyer*, 99 Wn.2d 114, 122, 660 P.2d 738 (1983).

¶12 The State has an interest in preserving life and preventing suicide. *Grant*, 109 Wn.2d at 556 (citing *Colyer*, 99 Wn.2d at 122). Those interests are implicated here. Mr. McNabb is not suffering from any terminal and incurable illness. He has stated his reasons for not eating:

> I am declining to eat for personal reasons. I am competent to make this choice. I have not been declared incompetent. I am deeply committed to that decision for that reason I have consistently declined to eat, except under threat of force-feeding, for almost six months. I am not using my fast as a means to seek or ask for any special privileges or favors or otherwise attempt to manipulate the system. My only wish is for my personal decision not to eat to be respected and to be left in peace for my fast to take its course.

Clerk's Papers at 7.

¶13  Mr. McNabb claims he is not attempting to commit suicide. He says he is merely allowing nature to take its course. But " '[i]n the popular, as well as the legal, sense, suicide means. . . . the death of a party by his own voluntary act.' " *Campbell v. Order of Wash.*, 53 Wash. 398, 403, 102 P. 410 (1909) (quoting *Bigelow v. Borkshire Life Ins. Co.*, 93 U.S. 284, 287, 23 L. Ed. 918 (1876)). It is important to note his situation is not one where he is suffering from a terminal and incurable illness and thus chooses to avoid highly invasive and intrusive procedures to postpone his death. *Grant*, 109 Wn.2d at 556. Rather, his situation is one where it can be inferred that the road to death is set in motion for purposes of committing suicide. *See id.* at 556-57 (stating that the State's interest in preventing suicide is not implicated when a death is neither set in motion nor intended by the patient). Thus, the compelling State interests of preserving life and preventing suicide control.

¶14  Moreover, within the state prison system, the State's interests involve the preservation of internal order and discipline, as well as maintaining institutional security. *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). Mr. McNabb claims nothing in the record shows his actions would cause a breakdown in prison discipline, jeopardize DOC's ability to enforce institutional order, or adversely affect the State's authority over its prison inmates. But he fails to acknowledge that " '[p]risoners are not permitted to live in accordance with their own desires, nor may they be permitted to die on their own terms without adversely and impermissibly affecting the state's legitimate authority over inmates.' " *People ex rel. Ill. Dep't of Corr. v. Millard*, 335 Ill. App. 3d 1066, 1072, 782 N.E.2d 966, 270 Ill. Dec. 407 (2003) (quoting *In re Caulk*, 125 N.H. 226, 231, 480 A.2d 93 (1984)). Although force-feeding may violate an inmate's right to privacy, this right is outweighed by the State's interest in the administration of the penal system. *Id.* at 1071.

¶15  This conclusion is also consistent with several other decisions upholding the right to force-feed hunger-striking

prisoners. *Laurie v. Senecal*, 666 A.2d 806, 808-10 (R. I. 1995) (authorizing force-feeding of a hunger-striking prisoner and finding there was no right under the state or federal constitution to override the State's interest in preserving life and preventing suicide); *Commonwealth Dep't of Pub. Welfare v. Kallinger*, 134 Pa. Commw. 415, 422, 580 A.2d 887 (1990) (allowing the force-feeding of a prison inmate by finding the State's interest in the orderly administration of the prison system outweighed a prisoner's diminished right to privacy); *Caulk*, 125 N.H. at 232 (holding that force-feeding of an otherwise healthy inmate did not violate State privacy rights); *State ex rel. White v. Narick*, 170 W. Va. 195, 292 S.E.2d 54 (1982) (ruling the State was not permitted to allow a prisoner in its custody to die from fasting).

¶16 While in custody, an inmate's right to privacy under our state constitution must be balanced against the State's interests in preserving life and maintaining an orderly and disciplined prison system. Because the State's interests should prevail in these circumstances, DOC may force-feed a starving inmate, whose actions are undertaken with the intent to cause his own death and have the potential of disrupting the internal order of our prison system. Mr. McNabb's state privacy rights are not violated by DOC's force-feeding policy.

¶17 Affirmed.

SCHULTHEIS and KURTZ, JJ., concur.

Review granted at 156 Wn.2d 1016 (2006).