THE PEOPLE *ex rel.* THE DEPARTMENT OF CORRECTIONS, Plaintiff-Appellee, v. HOSEA FORT, Defendant-Appellant.

Fourth District   No. 4—03—0661

Opinion filed September 15, 2004.

Alan J. Novick, of Bloomington, for appellant.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Brian F. Barov, Assistant Attorney General, of counsel), for appellee.

JUSTICE MYERSCOUGH delivered the opinion of the court:

Defendant, Hosea Fort, appeals the trial court's May 2003 permanent injunction, permitting the Department of Corrections (DOC) to force-feed defendant to prevent his death. Defendant argues the State failed to prove a legitimate penological interest was affected by defendant's hunger strike. We affirm.

# I. BACKGROUND

On April 18, 2003, the State filed a complaint for injunctive relief and motion for preliminary injunction, seeking an order allowing DOC to use necessary force (1) to monitor defendant's vital signs, blood chemistries, and heart function, and (2) to force-feed defendant if necessary to preserve his life. The State attached to the motion an affidavit from Dr. Arthur Funk, the medical director at Pontiac Correctional Center (Pontiac), which opined there was a substantial possibility that defendant could experience cardiac arrest, liver and neurological complications, or renal failure if his hunger strike continued. Therefore, Dr. Funk recommended defendant be force-fed. Following a hearing, the trial court granted the State a temporary restraining order, permitting DOC to monitor defendant and to force-feed defendant if necessary to prevent defendant's death.

On April 28, 2003, the trial court held a hearing on the preliminary injunction. Dr. Funk is board certified in internal medicine and licensed to practice in Illinois. Dr. Funk stated defendant has been on a number of hunger strikes, with the current hunger strike starting on April 12, 2003. Defendant was previously on a hunger strike from March 18 to April 1, 2003, and from April 2 to April 8, 2003. The hunger strikes started while defendant was incarcerated at Stateville Correctional Center (Stateville) and continued after his transfer to Pontiac on April 3, 2003.

After the issuance of the temporary restraining order, defendant was given oral supplements, which he occasionally refused to take. Defendant received an intravenous solution on April 18, 2003, for a short period of time. After administering these supplements, defendant's laboratory results were normal.

Defendant has been housed in the infirmary since he arrived at Pontiac. On April 17, 2003, defendant was examined by Dr. Kowalkowski, a psychiatrist, and he found defendant competent. Dr. Funk testified that defendant will die if he continues his hunger strike.

On cross-examination, Dr. Funk stated defendant suffers from a thyroid disorder, seizure disorder (epilepsy), and emphysema. Defendant had not had a seizure since arriving at Pontiac. Defendant is prescribed Dilantin for his seizures, which he occasionally refuses. Dr. Funk stated the seizure disorder is not curable; however, the seizures will not worsen with age, and the disorder is not a life-shortening condition.

According to Dr. Funk, defendant also suffers from emphysema, which is also not curable. Defendant's emphysema is currently stable, but it will worsen with age. Emphysema can shorten a person's life span. According to Dr. Funk, defendant's emphysema has not

progressed, and defendant has not complained of any discomfort due to emphysema. Defendant's thyroid disorder is also not curable. The disorder will not shorten defendant's life. The disorder can be treated by hormone replacement. However, defendant does not require treatment.

Dr. Funk stated that DOC's policy allows an inmate to refuse treatment for medical conditions, even if that treatment is necessary to save his life. On redirect examination, Dr. Funk stated that hunger strikes are not considered medical conditions. Dr. Funk further stated that DOC does not allow inmates to commit suicide.

Defendant testified that he did not know why he was transferred from Stateville to Pontiac. Pontiac was "a death trap" for him because of a 1993 incident involving allegations that defendant tried to kill the warden. After that incident, DOC transferred defendant out of Pontiac to Stateville.

Defendant started his hunger strike in response to a routine shakedown of his cell at Stateville. During the shakedown, defendant saw officers removing property from his cell, and he "went berserk." Defendant was taken to internal affairs and drug tested. The test came back negative. Defendant was placed in "1-a" for three days in response to his behavior during the shakedown. When he returned to his cell after the three days, defendant discovered much of his property was missing, and the missing property was not listed on a "shakedown list." A week or so later, some of defendant's missing property was found in the garbage can outside of Superintendent Hunter's office. Defendant believes that the officers took the property during the shakedown and threw it in the trash can where it was later discovered.

Defendant spoke to his sergeant, a couple of lieutenants, and a captain with DOC, who told defendant they would speak to Hunter. Defendant also wrote Hunter a letter. Hunter responded that he would come talk to defendant, but he never did. Defendant contacted another superintendent and an assistant warden, who referred the matter to internal affairs. On March 31, 2003, defendant told the assistant warden that he was on a hunger strike in response to his property being taken. On April 3, 2003, DOC transferred defendant to Pontiac. Defendant has never received his missing property.

Defendant stated that he was on a hunger strike at Pontiac because he fears for his life. Officers come to his room and stand in his door. Officers stand over him while he is sleeping, and they call him "Richard Speck." Defendant found a rope on his floor made out of cotton that was tied into a loop. Defendant stated that Pontiac does not allow inmates to have as much personal property as Stateville.

Defendant is in the infirmary at Pontiac, and therefore, he is not allowed his personal property. However, defendant has seen other inmates in the infirmary with personal property. Defendant has not had a change of underwear since arriving at the infirmary. Defendant is afraid to eat any food or drink the cold water at Pontiac. Defendant drinks hot water after the lead has been "cooked" out.

Defendant stated his seizure disorder causes him to tremble. Defendant does not take the full dosage of the medication prescribed to control the seizures. Defendant's emphysema makes breathing difficult. Defendant's thyroid disorder causes his weight to fluctuate.

Defendant stated he would continue his hunger strike at Pontiac because he believes "they would end up killing [him] anyway." Therefore, defendant stated if he was going to die in Pontiac, it was not going to be "by nobody else's hands but mine." Defendant further stated, "But I am not suicidal. I [am] not trying to kill myself. *** I am not trying to commit suicide."

On examination by the court, defendant stated that his hunger strike is "letting the administration know that by me prolonging this hunger strike, that they need to start taking me seriously." Defendant further stated he would stop the hunger strike if he was transferred back to Stateville because it "is just a much better facility." Defendant stated he would continue his hunger strike at Pontiac even if his property were returned.

Following the hearing, the trial court entered a preliminary injunction, pending hearing on the permanent injunction.

On May 16, 2003, a trial on the complaint for permanent injunction was held. The trial court took judicial notice of Dr. Funk's testimony from the preliminary injunction hearing. Defendant's testimony was substantially the same as his testimony at the preliminary injunction hearing, with defendant further detailing the unpleasant conditions at Pontiac. Following the trial, the trial court entered an injunction permitting DOC to force-feed defendant if necessary to prevent his death. Defendant filed a posttrial motion, which was denied, and this appeal followed.

## II. ANALYSIS

During the pendency of this appeal, DOC transferred defendant back to Stateville, and defendant ceased his hunger strike. Therefore, the present controversy is moot. The State, however, asks us to retain jurisdiction and consider the issue under the public-interest exception to the mootness doctrine. To invoke the public-interest exception, there must be (1) an issue of a public nature, (2) a desirability of an authoritative determination for the purpose of guiding public officers,

and (3) the likelihood that the question will generally recur. *People ex rel. Department of Corrections v. Millard*, 335 Ill. App. 3d 1066, 1069, 782 N.E.2d 966, 969 (2003), citing *Johnson v. Edgar*, 176 Ill. 2d 499, 513, 680 N.E.2d 1372, 1378 (1997).

■ This court, in a case of first impression, previously found this issue properly considered under the public-interest exception to the mootness doctrine. See *Millard*, 335 Ill. App. 3d at 1070, 782 N.E.2d at 969. In the instant case, we again find that it is appropriate to invoke the exception. Whether an inmate may starve to death while under the care of DOC is a matter of public importance, and the role of DOC in these situations is a recurring question. *Millard*, 335 Ill. App. 3d at 1070, 782 N.E.2d at 969. Moreover, the factual posture of the instant case is different from that in *Millard*, and therefore, DOC is in need of further guidance.

## A. Standard of Review

Defendant appeals the trial court's grant of a permanent injunction, arguing the State failed to prove a legitimate penological interest was affected by defendant's hunger strike.

■ "When granting permanent injunctive relief, the trial court, by definition, necessarily decides the plaintiff's success on the merits of the case. And when, as here, the case raises pure questions of law, we find that the determination of the merits of the permanent injunction is subject to *de novo* review." *Butler v. USA Volleyball*, 285 Ill. App. 3d 578, 582, 673 N.E.2d 1063, 1066 (1996), citing *Magee v. Huppin-Fleck*, 279 Ill. App. 3d 81, 85, 664 N.E.2d 246, 249 (1996). We, therefore, review *de novo* DOC's interest in administering the prison system against defendant's and other inmates' constitutional rights. *Millard*, 335 Ill. App. 3d at 1070, 782 N.E.2d at 969, citing *Quantum Pipeline Co. v. Illinois Commerce Comm'n*, 304 Ill. App. 3d 310, 314, 709 N.E.2d 950, 953 (1999).

## B. Trial Court's Grant of Permanent Injunction to DOC Was Proper

■ A prison regulation, even one that impinges on an inmate's constitutional right, is valid if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 87, 96 L. Ed. 2d 64, 77, 107 S. Ct. 2254, 2260 (1987). "[T]he preservation of life, prevention of suicide, and the enforcement of prison security, order, and discipline" are legitimate penological interests. *Millard*, 335 Ill. App. 3d at 1073, 782 N.E.2d at 971. Further, these interests are superior to the constitutional rights of an inmate whose hunger strike is an attempt to manipulate DOC. *Millard*, 335 Ill. App. 3d at 1073, 782 N.E.2d at 972.

■ In the instant case, the purpose of defendant's hunger strike was to manipulate DOC. Defendant was protesting his transfer to and treatment at Pontiac. Defendant testified at great length about the conditions at Pontiac and how the conditions at Stateville were far more preferable. Defendant testified that he did not want to commit suicide, and he did not want to die. Defendant also testified that returning his missing property, which was the motivation for starting the hunger strike, would *not* make him end his hunger strike. Instead, defendant testified that he would end his hunger strike if moved to another correctional facility less restrictive than Pontiac or if the staff at Pontiac who defendant alleged harassed him were no longer there. Clearly, defendant's hunger strike was intended to manipulate DOC into improving his conditions while incarcerated.

Finally, defendant's argument that the facts of the instant case are distinguishable from *Millard* are unpersuasive. Defendant argues that the grant of a permanent injunction in the *Millard* case was, according to the trial court, "pragmatic" because the defendant was scheduled for release from DOC within a few months of the court's ruling. Therefore, the trial court in *Millard* believed the defendant could wait until released and kill himself "on his own time." On appeal, however, the timing of the defendant's release from DOC was not a factor this court considered in finding that the defendant's hunger strike was an attempt to manipulate DOC. Similarly, in the instant case, defendant's scheduled release from DOC in 2027, when defendant is approximately 80 years old, is not determinative as to whether defendant is attempting to manipulate DOC by his hunger strike. Therefore, the trial court's grant of a permanent injunction was not in error.

## III. CONCLUSION

For these reasons, we affirm the trial court's grant of a permanent injunction, allowing DOC to force-feed defendant to prevent his death.

Affirmed.

COOK, J., concurs.

JUSTICE STEIGMANN, dissenting:

I respectfully dissent for the reasons expressed by Justice Knecht in his thoughtful dissent in *Millard. Millard*, 335 Ill. App. 3d at 1074-75, 782 N.E.2d at 972-73 (Knecht, J., dissenting).