## THERESA C. LANTZ, COMMISSIONER, DEPARTMENT OF CORRECTION *v.* WILLIAM B. COLEMAN

Superior Court, Judicial District of Hartford

File No. No. HHD-CV-08-4034912-S

Memorandum filed May 21, 2008

*Lynn D. Wittenbrink* and *Ann E. Lynch,* assistant attorneys general, for the plaintiff.

*Robert A. Serafinowicz,* for the defendant.

GRAHAM, J. This case presents the question of whether the state may force-feed an inmate engaged in a hunger strike. There appears to be no recorded Connecticut decision on point.[1] The plaintiff, Theresa

---

[1] The plaintiff, Theresa C. Lantz, commissioner of the department of correction, has supplied a transcript indicating that a similar injunction was issued orally in court in *Warden* v. *Saia,* judicial district of Tolland (April 29, 1988) (*Mack, J.*).

C. Lantz, is the current commissioner (commissioner) of the department of correction (department). The defendant, William B. Coleman, is a sentenced prisoner, under the care of the department. He was convicted, after a jury trial, of sexual assault in a spousal relationship and unlawful restraint in the first degree. In May, 2005, he was sentenced to fifteen years imprisonment, execution suspended after eight years. His maximum discharge date is December 30, 2012.

The defendant, a British citizen, is currently incarcerated at MacDougall-Walker Correctional Institution. On September 4, 2007, the Appellate Court issued its decision affirming his conviction.[2] He began a hunger strike on September 16, 2007, when he stopped eating solid food. At that time, he weighed 250 pounds. He continued that strike through the time of the hearing in this case.

On January 9, 2008, the plaintiff filed a verified complaint, seeking both a temporary and permanent injunction to allow the department to force-feed the defendant. On January 14 and 23, 2008, the court held an evidentiary hearing on the application for a temporary injunction. At the conclusion of the evidence, the court heard oral argument from counsel for each party and, because of the exigent circumstances, issued an order orally. The court issued a temporary injunction authorizing the department to provide the defendant with intravenous fluids or nasogastric feeding and other necessary health care measures, even by means of reasonable force, and enjoining the defendant from interfering with same. The court's findings and reasoning were deferred to this subsequent written decision.

At the time of the hearing, the defendant, who is forty-seven years old and five feet ten inches tall, weighed no more than 160 pounds. He has two dependent children,

---

[2] See State v. William C., 103 Conn. App. 508, 930 A.2d, 753, cert. denied, 284 Conn. 928, 934 A.2d 244 (2007).

ages nine and eleven. The parties agreed that the defendant is mentally competent, and the testimony of Suzanne Ducate, a board certified forensic psychiatrist, confirmed it.

Ducate has been the director of psychiatry for the department for the last one and one-half years. Prior to that, she was the director of mental health services for the Texas department of corrections for six years, director of mental health services at the University of Connecticut Health Center for inmate managed health care for one and one-half years and a psychiatrist at the Whiting Forensic Division of Connecticut Valley Hospital for one and one-half years. She is also board certified in general psychiatry and addiction psychiatry.

Ducate met the defendant twice, for the purpose of psychiatric evaluation. She found his cognitive abilities to be intact and found him to be of above average intelligence. He expressed to her his strong belief that he had been wrongfully convicted and that such, combined with his perception that his former spouse was disparaging him to his sons, constituted child abuse. Those were his stated reasons to her for his hunger strike. She testified that the defendant has no axis I diagnosis, i.e., no major functional disorder of an acute nature. She indicated that he has an axis II diagnosis of narcissistic personality disorder, which makes him unable to perceive the impact of his actions on others, leads him to view events only from his perspective and makes him want to appear positively to others. She testified that this disorder contributes to his decision to starve himself.

Ducate has experience with hunger strikes, and ending them, on six occasions in Texas. She indicated that the preferred means of feeding an inmate on a hunger strike is to sedate the prisoner, insert a nasogastric tube into his stomach, via the nose and throat, and then pipe

nourishing liquid directly into the stomach. It is not a medically difficult procedure, and, in her experience, inmates who are so fed begin to eat normally soon thereafter.

On the basis of her experience with hunger strikes in Texas, she believes that such incidents have a serious and detrimental effect on the other inmates. In her experience, inmates look to the department for their care and would be shocked if an inmate was allowed to kill himself without intervention. She adds that a hunger strike has a detrimental impact on prison safety and security. In this case, where the defendant is in the infirmary full-time, it leads directly to mentally ill prisoners being transferred to other facilities, away from treatment teams familiar with them, because this inmate is taking an otherwise available bed for his self-induced hunger strike.

Edward Blanchette, an internist, is the clinical director for the department. He has examined the defendant from a physical aspect and has been monitoring his condition since the end of last September. He reviews the defendant's medical records thrice weekly and has met with him twice. The defendant has been taking only liquids, those being water, some juice and some milk. Although the defendant is adequately hydrated, he is taking insufficient calories to sustain himself. The defendant has already suffered muscle wasting and anemia but, by taking some milk, has slowed the speed of his deterioration. Blanchette testified that as of January 14, the defendant could cause himself serious physical damage within one month, and be in dire straits. Risks include the possibility of heart arrhythmia due to electrolyte imbalance, a life threatening situation. A sustained hunger strike will lead to kidney and liver failure, and eventually to death. Blanchette opined that the timing of such deterioration is not subject to precise calculation by a physician or fine-tuning by an inmate.

He stated that it is unusual for an inmate to engage in a protracted hunger strike, such as the defendant's.

Brian K. Murphy, deputy commissioner of operations for the department, who is responsible for supervision of all inmates and is a career department employee, testified as to the impact of a hunger strike on the inmate population. Murphy has risen, in twenty-six and one-half years, from a correctional officer to his present position, always with direct supervision of inmates. He became aware of the defendant's hunger strike last September and has been following it since, including meeting with the defendant. The department has taken no disciplinary action of any kind against the defendant for his hunger strike. On more than twenty past occasions, Murphy has had to deal with hunger strikes. He is adamant that there are no secrets in prisons, that inmates rely on the department to intervene to protect inmates from self-harm and that the defendant's death from a hunger strike could cause unrest, including demonstrations and physical violence. There is also the risk of copycat hunger strikes to manipulate the prison system, should the defendant's hunger strike continue.

I find the testimony of each of these three state witnesses to be entirely credible and persuasive.

The defendant testified at the hearing. He admitted to having taken milk, juice and water over the last four months, predominantly during the holiday season, both to spare his family his possible demise at that time of year and, later, to keep his strength for this hearing. He states the reason for his hunger strike is to protest his children's abuse, by which he means his not seeing them and their growing up to believe he is a criminal. His second reason is to cause an investigation into his conviction and the conditions surrounding it, including the custody dispute over his children. He is unequivocal in his willingness to die by starvation absent a further

governmental investigation. I find this testimony to also be credible and his stated willingness to die by starvation to be sincere.

The defendant's desire to seek publicity because of his belief that the court system is inadequate did not begin with his criminal conviction, and a court has previously noted that desire, as well as his inability to comprehend the effects of his wishes on others. In the trial memorandum of decision in *Coleman* v. *Coleman*, Superior Court, judicial district of Waterbury, Regional Family Trial Docket, Docket No. FA-020174562 (August 5, 2004) (*Munro, J.*), the court found: "The defendant, believing that he is a victim of parental alienation syndrome . . . fostered by court process, seeks at some point in the future to bring media attention to his plight . . . but [he] failed to understand that this publicity might ultimately be very unsettling for the boys and undermine their ability to live their respective childhood free from the unusual scrutiny and notoriety that media attention often brings. The [father's] failure to appreciate this important aspect of protecting his children as a paramount issue is disconcerting."

In considering whether to issue the requested temporary injunction, the court must determine if there will be irreparable and imminent injury absent the injunction, if the state has an adequate remedy at law, the likelihood of the state's prevailing in the case on the merits and if a balancing of the equities favors the granting of this injunction. See *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 230 Conn. 441, 446, 645 A.2d 978 (1994).

It is obvious that the state has no adequate remedy at law to prevent the death of the inmate defendant. Counsel for the defendant has argued that this hearing and motion are premature, and that there is insufficient evidence that the defendant is in danger of imminent

harm. He proposes that the state wait until one month after the hearing to see if the anticipated dire physical harm to the defendant occurs and then seek an immediate further hearing if it occurs. Further, he challenges, without contrary evidence, the testimony that harm to the defendant from his hunger strike will impair the security and administration of the prison.

It would be impractical in the extreme, and dangerous to both the person of the defendant and the security and orderly administration of the prison in which he is housed, to wait until he was already suffering organ failure or other evidence of permanent damage to his health, before allowing the state to seek this injunction. "Forcing the Department to wait until [the inmate's] medical status deteriorates to the point of emergency before it can take further life-preserving measures would put the Department in an untenable and precarious situation. Should [defendant] continue to refuse food, his condition could decline so rapidly that it might not be possible to obtain emergency treatment in a sufficiently timely way to save his life." *Commissioner of Correction* v. *Mortimer*, No. SUCV-2006-2713B, Commonwealth of Massachusetts Superior Court (July 19, 2006) (Tuttman, J.).

It is clear that Blanchette's estimate of the defendant's future medical deterioration is only an estimate and neither capable of extreme precision nor immune to variance. The state has demonstrated irreparable harm and imminent injury to both the person of the defendant and the attendant security and orderly administration of the prison, absent an injunction.

A balancing of the equities favors the granting of this injunction. The department has been neither dilatory nor premature in bringing this action and has dealt openly with the defendant during his hunger strike. Preserving the defendant's life during the pendency of

this action, which seeks a permanent injunction, will preserve his life until a final determination on the merits, without prejudicing his ability to renew his hunger strike should he prevail at trial.[3] Preserving the status quo while awaiting a trial is a valid purpose for a temporary injunction. See *Clinton* v. *Middlesex Mutual Assurance Co.*, 37 Conn. App. 269, 270, 655 A.2d 814 (1995).

There remains the question of the state's probability of success on the merits in this case. The question on which other jurisdictions have split, and which directly impacts the likelihood of the state's success on the merits, is whether the state may use medical procedures to force-feed a prisoner engaging in a hunger strike.

The Supreme Court of the United States has recognized that a competent individual has the right to refuse life-saving medical treatment. *Cruzan* v. *Director, Missouri Dept. of Health*, 497 U.S. 261, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990); see also *Washington* v. *Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). "[N]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. . . . This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment. . . . Every human being of adult years and sound mind has a right to determine what shall be done with his own body . . . . The informed consent doctrine has become firmly entrenched in American tort law. . . . The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment." (Citations omitted; internal

---

[3] The defendant declined to consolidate the temporary injunction hearing with an immediate trial on the permanent injunction.

quotation marks omitted.) *Cruzan* v. *Director, Missouri Dept. of Health*, supra, 269–70.

Although a prisoner does not forfeit all of his constitutional protections upon incarceration, a certain amount of restriction and limitation necessarily follows. "[S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. . . . The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. . . . There must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. . . . A detainee simply does not possess the full range of freedoms of an unincarcerated individual." (Citations omitted; internal quotation marks omitted.) *Bell* v. *Wolfish*, 441 U.S. 520, 545–46, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); see also *Hudson* v. *Palmer*, 468 U.S. 517, 523, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (stating that incarcerated prisoner has only "those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration").

Connecticut has recognized the importance of security and discipline in a prison environment and the challenge of maintaining them. "Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex

and intractable, and, more to the point, they are not readily susceptible of resolution by decree." (Internal quotation marks omitted.) *Washington* v. *Meachum*, 238 Conn. 692, 733–34, 680 A.2d 262 (1996).

The majority of state and federal courts addressing the issue of whether the state may intervene in an inmate hunger strike have made an effort to balance the interests of the state in the preservation of life and the orderly administration of the prison system and the interests of innocent dependents against the prisoner's right to self-determination and privacy. For one or more reasons, they have upheld the state's right to intervene.

The five factors stated in case law allowing state intervention have been the orderly administration and security of the prison system, the prevention of manipulation by the prisoner of the prison and judicial system, the preservation of life, the protection of innocent dependents and the maintenance of ethical integrity of the medical professionals involved.

The Appellate Court of Illinois, fourth district, relied on the first three factors in *People ex rel. Dept. of Corrections* v. *Fort*, 352 Ill. App. 3d 309, 314, 815 N.E.2d 1246 (2004). In that case, the prisoner went on a hunger strike to protest his transfer to a different prison. Id., 315. The court determined that "the purpose of defendant's hunger strike was to manipulate [the department of corrections]." Id. "[T]he preservation of life, prevention of suicide, and the enforcement of prison security, order, and discipline are legitimate penological interests. . . . Further, these interests are superior to the constitutional rights of an inmate whose hunger strike is an attempt to manipulate [the department of corrections]." (Citation omitted; internal quotation marks omitted.) Id., 314.

In *State ex rel. Schuetzle* v. *Vogel*, 537 N.W.2d 358, 360–61 (N.D. 1995), the Supreme Court of North Dakota

determined that the state could force-feed and administer insulin to a diabetic prisoner who refused to eat or take medicine. Finding that the prisoner attempted this to "manipulate the system and . . . blackmail . . . prison officials"; (internal quotation marks omitted) id., 360; the court ruled that "the state's interest in orderly prison administration is the controlling factor here . . . ." Id., 361.

This issue has arisen in federal cases in the specific context of civil contemnors trying to circumvent the judicial process. A civil contemnor being held for refusing to testify before a grand jury went on a hunger strike for political and religious reasons. *In re Grand Jury Subpoena John Doe* v. *United States*, 150 F.3d 170, 171 (2d Cir. 1998) (per curiam). In a very brief opinion, the court held that "the district court's force-feeding order . . . does not violate a hunger-striking prisoner's constitutional rights. . . . Although Doe, as a civil contemnor, has been convicted of no crime, the institution where he is housed is still responsible for his care while incarcerated. Other compelling governmental interests, such as the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline, outweigh the constitutional rights asserted by Doe in the circumstances of this case." Id., 172. The United States District Court for the Southern District of New York has also addressed this issue in the context of a civil contemnor, focusing on preventing the contemnor from undermining the judicial process. *In re Sanchez*, 577 F. Sup. 7 (S.D.N.Y. 1983). The court held that "Sanchez is, by his own admission, *attempting to bring maximum pressure to bear upon the Judge who will ultimately rule upon his motion to vacate the contempt order. Moreover, the prolongation of this hunger strike will soon render Mr. Sanchez physically or mentally incapable of testifying before the grand jury, thereby rendering further coercive sanctions futile. In

one sense, therefore, Mr. Sanchez is attempting to escape from prison and to frustrate the lawful authority of the courts. This is a purpose that we cannot condone." Id., 9.

The preservation of the life of a prisoner in the state's custody is also a factor that courts have considered. The Supreme Court of Rhode Island used this reasoning when it addressed the issue of a prisoner starving himself. "It has been argued . . . that starving oneself is not an act of suicide but by some leap of logic constitutes merely setting certain natural forces in motion. The same argument might be presented in the event that a prisoner should slash his wrists with a razor blade and then resist all efforts to staunch the bleeding. The similarity between the two instances is that the person who desires to end his or her life deliberately sets a force in motion that will be fatal unless intervention occurs. . . . [T]he state has a right, and indeed a duty, to intervene in such circumstances. . . . [T]here is no right under either the State or the Federal Constitution to override the compelling interest of the state in the preservation of his or her life and the prevention of suicide." *Laurie* v. *Senecal*, 666 A.2d 806, 809 (R.I. 1995). Similarly, the Supreme Court of New Hampshire determined that "[t]he State's interests in the preservation of human life and the prevention of suicide are also implicated in this situation." *In re Caulk*, 125 N.H. 226, 231, 480 A.2d 93 (1984).

Although the integrity of the medical profession is sometimes mentioned as a factor in case law; see id.; and it was pleaded by the state, there was no testimony as to such, it was not briefed and the court finds that claim to be abandoned.

"The [next] consideration is the protection of innocent third parties. . . . Generally this concern arises when the refusal of medical treatment . . . implicates

the emotional or financial welfare of the [inmate's] minor children." *Thor* v. *Superior Court*, 5 Cal. 4th 725, 744, 855 P.2d 375, 21 Cal. Rptr. 2d 357 (1993). There was evidence here of the young age of the defendant's children. His release will come during their minority, he lacks custody of them and can be held responsible for child support upon his release.

Finally, there is one consideration that did not come up explicitly in any case. "Curiously absent from any state arguments or judicial opinions are the more philosophical notions that a prisoner should be forced to live out his sentence as a form of retribution for his crimes. . . . The idea is that by permitting an inmate to effectively avoid his mandated time in jail, the state is enabling him to circumvent the punishment society has deemed appropriate." M. Silver, "Testing *Cruzan*: Prisoners and the Constitutional Question of Self-Starvation," 58 Stan. L. Rev. 631, 643 (2005). It should be noted that the New Hampshire Supreme Court approached this line of reasoning in *In re Caulk*, stating that "[p]risoners are not permitted to live in accordance with their own desires, nor may they be permitted to die on their own terms without adversely and impermissibly affecting the State's legitimate authority over inmates." *In re Caulk*, supra, 125 N.H. 231.[4]

In contrast, three courts have decided that the state has no right to force-feed an inmate. The Supreme Court of Georgia affirmed a trial court's decision to deny the state's petition to force-feed a hunger striking inmate. *Zant* v. *Prevatte*, 248 Ga. 832, 286 S.E.2d 715 (1982). In so doing, the court considered that "[the inmate] is not mentally incompetent, nor does he have dependents who rely on him for a means of livelihood. The issue

---

[4] The dissent in *In re Caulk* reflects on the contradiction of this position with the New Hampshire ethos: "Our State motto proudly proclaims the choice to 'live free or die.' If he can't do the former, I would permit the latter for Mr. Caulk." *In re Caulk*, supra, 125 N.H. 232–33 (Douglas, J., dissenting).

of religious freedom is not present. Under these circumstances, we hold that [the inmate], by virtue of his right of privacy, can refuse to allow intrusions on his person, even though calculated to preserve his life. The State has not shown such a compelling interest in preserving [the inmate's] life, as would override his right to refuse medical treatment." Id., 834. The state did not claim any of the traditional factors except a duty to preserve the inmate's health and life.

In 1993, the Supreme Court of California determined that the state had no authority to interfere with an inmate's hunger strike. *Thor* v. *Superior Court*, supra, 5 Cal. 4th 725. The court's holding specified that "under California law a competent, informed adult has a fundamental right of self-determination to refuse or demand the withdrawal of medical treatment of any form irrespective of the personal consequences." Id., 732. The court further stated that "[u]nder the facts of this case, we further conclude that in the absence of evidence demonstrating a threat to institutional security or public safety, prison officials, including medical personnel, have no affirmative duty to administer such treatment and may not deny a person incarcerated in state prison this freedom of choice." Id.

*Thor* involved a prison physician petitioning the court to allow him to force-feed a quadriplegic patient who had decided to die. Id. The court considered four state interests: preserving life; preventing suicide; maintaining the integrity of the medical profession; and protecting innocent third parties. Id., 737. Finally, the court considered how this would affect orderly administration of the prison system. Id., 744. In considering the first four factors, the court noted that this patient was quadriplegic and serving a life sentence; the patient's decision to refuse medical treatment was an informed decision, and there were no other persons involved in

this decision. Id., 743–44. Finally, the state had presented no evidence on the effect this would have on administration of the prison system. Id., 745.

The third case prohibiting state interference with a prisoner's hunger strike is from Florida. The inmate went on a hunger strike to protest his transfer to a different prison and to protest the lodging of complaints against a prison chaplain. *Singletary* v. *Costello*, 665 So. 2d 1099, 1101 (Fla. App. 1996). The court first recognized a strong interest in the inmate's rights to privacy and to refuse medical treatment. Id., 1104. The court then weighed the state's interests in preserving life, preventing suicide, protecting third parties, maintaining the ethics of the medical profession, and maintaining order in the prison. Id., 1105. On the facts of the case, the court stated that "although the state interest in the preservation of life is powerful, in and of itself, it will not foreclose a competent person from declining life-sustaining medical treatment. . . . This is because the life that the state is seeking to protect is the life of the same person who has competently decided to [forgo] the medical intervention." (Citation omitted.) Id., 1109. The court found it important, also, that the prisoner had expressly stated that he did not want to die, meaning that the state's interest in preventing suicide was not implicated. Id. Finally, no evidence was offered on the other factors; therefore, the court denied the state's petition.

In the present case, there was ample and convincing evidence that allowing the defendant to starve himself to death will harm the orderly administration and security of the prison where he is incarcerated, upsetting the other inmates, requiring additional measures to deal with the inmate reactions and potentially causing unrest, demonstrations and violence. His suicide by starvation would be contrary to the preservation of his life. He seeks by his hunger strike to force a further

investigation by state authorities into his criminal conviction and its circumstances, which is an attempt to manipulate the state. And his death would deprive his innocent, dependent children of his future financial support. For all of these reasons, the state has established a reasonable degree of probability of success on the merits in this case.

The criteria for a temporary injunction have been met, and the court has granted the relief sought by the plaintiff, the commissioner.