Dwayne HILL, Appellant

v.

**DEPARTMENT OF CORRECTIONS.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 15, 2010.
Decided April 7, 2010.

Dwayne Hill, appellant, pro se.

Robert B. MacIntyre, Asst. Counsel and Suzanne N. Hueston, Chief Counsel, Camp Hill, for appellee.

BEFORE: LEADBETTER, President Judge, SIMPSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge SIMPSON.

In this appeal, Dwayne Hill (Hill), an inmate who has engaged in a series of hunger strikes, asks whether the Court of Common Pleas of Huntingdon County (trial court) erred in issuing a preliminary injunction authorizing the Department of Corrections (DOC): (1) to involuntarily examine and perform invasive diagnostic tests including blood and urine tests on him, and (2) to administer medical treatment including nutrition and hydration as may in the opinion of the medical staff be necessary to preserve his health and life. Representing himself, Hill argues the trial court erred in issuing the injunction because DOC lacked standing to seek the requested relief and because DOC had an adequate remedy at law.

Upon review, we reject Hill's contentions. However, we conclude DOC did not present sufficient evidence to support a determination that Hill's health was at such imminent risk so as to justify the involuntary administration of nutrition and hydration. We further conclude the evidence presented was sufficient to allow DOC to involuntarily examine Hill and perform invasive diagnostic tests, including blood and urine tests. Thus, we affirm as modified.

Hill is currently serving a life sentence at SCI–Houtzdale. Since 2006, Hill has engaged in a number of hunger strikes.

In late–May 2009, Hill began another hunger strike. Shortly thereafter, DOC filed a complaint, a motion for a preliminary injunction and an application for *ex parte* preliminary injunction through which it sought to permit its medical staff to involuntarily examine Hill, administer Hill medical treatment, and supply Hill nutrition and hydration as necessary to preserve Hill's health and life. The complaint alleged Hill had a recent history of engaging in hunger strikes, and during his most recent hunger strike he missed 24 consecutive meals.

In early–June, the trial court granted DOC's application for *ex parte* preliminary injunction and scheduled a hearing a few days later.

At the hearing, Hill testified, and DOC confirmed, that Hill resumed eating. Hill also assured the trial court he would continue to eat. As a result, the trial court denied DOC's request for a preliminary injunction, but it directed a hearing be scheduled after Hill filed a response to DOC's complaint.

Shortly thereafter, Hill filed preliminary objections to DOC's complaint. In addition, DOC requested reconsideration of the trial court's denial of preliminary injunction. Another hearing ensued before the trial court at which DOC presented the testimony of Patricia Everhart, an SCI registered nurse supervisor (Nurse Supervisor) and Dr. Phillip Shoaf, medical director at SCI–Huntingdon (Physician).

Nurse Supervisor testified that, as of the time of her testimony, Hill missed 42 consecutive meals and refused offers of water as well as requests to monitor his vital signs and weight. Physician testified he visits Hill daily, Hill routinely refuses requests for physical examinations, and Hill had not eaten in 14 or 15 days.

Hill attended the hearing and engaged the trial court in various dialogues. Although he raised various objections, Hill did not raise a claim of religious freedom or of right to privacy or of a liberty interest to support his decision not to eat. In fact, Hill did not express a desire to die. Instead, Hill expressed dissatisfaction with his restricted housing unit placement and

the failure of DOC to more expeditiously transfer him to another correctional institution. Notes of Testimony of June 29, 2009 (N.T.) at 13–14, Certified Record (C.R.), Item # 10 ("I want out of the hole. I don't care how they do it.").

At the conclusion of the hearing, the trial court issued an order authorizing DOC to:

> involuntarily examine and perform invasive diagnostic tests including blood and urine tests on [Hill] and [to] administer medical treatment including nutrition and hydration as may in the opinion of the medical staff be necessary to preserve his health and life.

Tr. Ct. Order, 6/29/09, C.R., Item # 5. Hill appealed to this Court.

The trial court subsequently issued an opinion in support of its order. Citing *Department of Public Welfare, Farview State Hospital v. Kallinger*, 134 Pa. Cmwlth. 415, 580 A.2d 887 (1990) (single judge opinion by Pellegrini, J.), the trial court stated it issued the injunction because the Commonwealth has a duty to protect the health and welfare of prisoners and to provide appropriate medical treatment. The trial court stated DOC presented compelling evidence to justify the order entered. This matter is now before us for disposition.

At the outset, we note, the trial court's order granting DOC's requested relief was entered in response to DOC's request for reconsideration of the trial court's denial of DOC's request for preliminary injunction. Therefore, the order under review is an order granting a preliminary injunction. With regard to the issuance of a request for a preliminary injunction, this Court has explained:

> A preliminary injunction is to put and keep matters in the position in which they were before the improper conduct of the defendant commenced. *Little*

*Britain Township Appeal*, 651 A.2d 606 (Pa.Cmwlth.1994). The sole object of a preliminary injunction is to preserve the subject of the controversy in the condition in which it is when the order is made, it is not to subvert, but to maintain the existing status until the merits of the controversy can be fully heard and determined. *Id.* In the hearing upon a preliminary injunction, it is neither necessary nor proper to decide the case as though on final hearing. *Id., citing Crestwood Sch. Dist. v. Topito*, 76 Pa.Cmwlth. 321, 463 A.2d 1247 (1983). A preliminary injunction cannot serve as a judgment on the merits since by definition it is a temporary remedy granted until that time when the party's dispute can be completely resolved. *Little Britain Township Appeal.*

*Chipman v. Avon Grove Sch. Dist.*, 841 A.2d 1098 (Pa.Cmwlth.2004).

We review an order granting a preliminary injunction to determine whether or not reasonable grounds appear for the granting of the preliminary injunction, and not to pass on the merits of the dispute. *Id.* To sustain a preliminary injunction, the plaintiff's right to relief must be clear, the need for relief must be immediate, and the injury must be irreparable if the injunction is not granted. *Id.* Additionally, we often consider whether greater injury will occur from refusing the injunction than granting it and whether the injunction returns the parties to the status quo as it existed before the alleged wrongful conduct. *Id.*

On appeal, Hill contends the trial court erred in failing to sustain his preliminary objections in which he asserted: DOC lacked standing to seek injunctive relief; he has a constitutionally protected right to engage in hunger strikes and, therefore, DOC's complaint was legally insufficient to

state a claim; and, DOC had an adequate remedy at law in the nature of an action for damages or an action under the Mental Health Procedures Act (MHPA).[1]

■■■ Hill first argues DOC lacked standing to seek the requested injunction.

In response, DOC argues in *Kallinger*[2] this Court held the Commonwealth has a right to force a prisoner within the Commonwealth's penal system to receive involuntary medical treatment and nutrition and hydration through a feeding tube. It contends Hill does not assert *Kallinger* was improperly decided and, therefore, we should reaffirm our prior ruling in that case and affirm the trial court here. Upon review, we are persuaded that *Kallinger* was properly decided, and we confirm its holding and apply it here.

In *Kallinger*, the Department of Public Welfare (DPW) sought declaratory judgment authorizing the involuntary administration of necessary nutrition and medical treatment to Joseph Kallinger, an inmate housed at Fairview State Hospital, who refused to accept nutrition and medical treatment. At the outset of his decision, Judge Pellegrini explained:

> We are called upon to decide a sensitive matter which is without precedent in this Commonwealth.... Kallinger wants to starve himself to death. [DPW], who has custody, wants to force him to involuntarily receive food through a nasogastric tube and other medical treatment. We must decide if [DPW] has such right.
>
> \*     \*     \*
>
> What this case concerns is whether the Commonwealth's interest in an orderly

administration of the prison system is paramount over any residual right of privacy that Kallinger has which would make it an invasion of privacy on the part of the Commonwealth to force feed him.

> *The narrow issue then presented to us is whether the Commonwealth has a right to force a competent prisoner within the Commonwealth's penal system to receive involuntary medical treatment and nutrition and hydration through a nasogastric feeding tube.* To decide this issue, a balancing test is employed, balancing the Commonwealth's interests against the prisoner's remaining right to privacy.

*Id.* at 888, 890 (emphasis added) (citation and footnote omitted). In holding the Commonwealth had the right to compel involuntary medical treatment and nutrition, Judge Pellegrini determined the Commonwealth: had an "overwhelming interest" in maintaining prison security, order and discipline, *id.* at 890; had a strong interest in maintaining the health and safety of prisoners in its custody based on its related interests in the preservation of human life and the prevention of suicide; and, had an interest in maintaining the integrity of the psychiatric and medical professions working within the penal system. Thus, Judge Pellegrini ordered the facility at issue could "and must continue to provide appropriate nutrition through a nasogastric tube and appropriate medical care to ... Kallinger so long as he continues to refuse nutrition and medical treatment." *Id.* at 893; *see also Lantz v. Coleman*, 51 Conn.Supp. 99, 978 A.2d 164 (2009) (granting temporary injunction au-

---

1. Act of July 9, 1976, P.L. 817, *as amended*, 50 P.S. §§ 7101–7503.

2. Pursuant to 210 Pa.Code § 67.55 (Commonwealth Court Internal Operating Procedure § 414), a single-judge opinion, even if reported, shall be cited for its persuasive value, not as binding precedent.

thorizing state department of corrections to force-feed inmate engaged in hunger strike based on department's interests in preservation of life and maintaining prison security and discipline, particularly where inmate's goal in engaging in hunger strike was to manipulate the state); Peter Wood, Comment, *The Right to Refuse Medical Treatment: Courts' Disparate Treatment of Incarcerated Patients*, 112 Penn. St. L. Rev. 1167 (2008) (recognizing numerous courts have denied inmates the right to refuse unwanted medical treatment based on state interests such as the preservation of internal order and discipline within a prison and the maintenance of institutional security).

Here, as in *Kallinger*, the record reveals Hill repeatedly engaged in hunger strikes and, as of the trial court hearing, he missed 42 consecutive meals. N.T. at 2–3, 7–8. As in *Kallinger*, we believe DOC's interest in maintaining prison security, order and discipline, and its interest in preserving the health and safety of prisoners, apply with equal force and outweigh any privacy right claimed by Hill. Before the trial court, however, DOC did not present evidence that Hill's life was in imminent danger absent forced nutrition and hydration. Thus, the decree fashioned by the trial court was overly broad. However, DOC did present evidence that, at the time of the hearing, Hill refused opportunities for water and refused to allow medical staff to monitor his vital signs and weight. N.T. at 3, 7–8. Consequently, we believe it is appropriate to modify the trial court's order so as to only authorize DOC to involuntarily examine and perform invasive diagnostic tests on Hill including blood and urine tests. *See* 42 Pa.C.S. § 706 (authorizing an appellate court to "affirm, *modify*, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such

further proceedings to be had as may be just under the circumstances.") (Emphasis added) The trial court may proceed to the permanent injunction stage at a time when additional information regarding Hill's condition becomes available and warrants such relief.

■ Alternatively, Hill argues the trial court erred in failing to dismiss DOC's complaint in its entirety based on his protected First Amendment right to freedom of expression. Hill asserts this matter stems from DOC's abuse of authority in using solitary confinement as a tool of repression designed to break a prisoner's will to resist conditions that are "sub-human, degrading and illegal" and, in protest, he initiated a hunger strike, a cognizable form of expression. Appellant's Br. at 6. We reject this argument.

■ Merely because a person is incarcerated does not deprive him of all of his constitutional rights. *Thornburgh v. Abbott*, 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). However, "[i]ndividual freedoms may be curtailed whenever prison officials, in exercise of their informed discretion, reasonably conclude that their exercise possesses the likelihood of disrupting prison order or stability or otherwise interfering with the legitimate penological objectives of the prison environment." *Kallinger*, 580 A.2d at 890–91.

At the hearing before the trial court here, Hill did not assert that his act of engaging in a hunger strike represented a constitutionally protected form of free expression. In any event, we believe the curtailment of Hill's right to freedom of expression is justified when viewed against DOC's needs in maintaining an orderly prison facility and the health and safety of its prisoners. Indeed, in *Von Holden v. Chapman*, 87 A.D.2d 66, 450 N.Y.S.2d 623 (N.Y.App.Div.1982), which Judge Pellegri-

ni cited with approval in *Kallinger,* the Supreme Court of New York, Appellate Division, rejected a similar "freedom of expression" argument raised by Mark Chapman, an inmate serving a sentence for the murder of former Beatle John Lennon who was attempting to starve himself to death while in a mental institution. The Court in *Chapman* stated:

> Chapman urges that his fasting was not an attempt at suicide but rather symbolic speech entitled to the protection of the First Amendment. In that regard, he claims that he was attempting to draw public attention to the starving children of the world. Accepting that proposition for the sake of discussion, we need only remark that Chapman's status as a prisoner renders his First Amendment rights subject to the reasonable limitations necessary for the maintenance of order and discipline in a penal institution. Whereas a prisoner's right of expression may not be circumscribed to an extent greater than that required for the legitimate ends of prison security and administration, those legitimate interests clearly include the need to prevent a prisoner's suicide even if cloaked in the guise of First Amendment expression.

*Id.* at 70–71, 450 N.Y.S.2d 623 (citations omitted). We agree with the Court in *Chapman.* In short, DOC's need to maintain order in its correctional institutions, coupled with its need to prevent Hill's suicide, justifies the claimed restriction on Hill's right to freedom of expression.

As a final point, Hill contends the trial court erred in granting injunctive relief where an adequate remedy at law existed. To that end, Hill argues that "[t]he sole basis for [DOC's] claim is that [it] will suffer financial loss from force feeding [him]" and, therefore, DOC had an adequate remedy in the form of an action for damages. Appellant's Br. at 6. In addition, Hill argues DOC has a complete and adequate statutory remedy under the MHPA. Again, we reject Hill's assertions.

First, as to Hill's claim that an action for damages constitutes an appropriate remedy, we recognize that DOC averred Hill's conduct in engaging in the hunger strike threatened the orderly administration of SCI–Huntingdon. This threat, coupled with DOC's interest in preserving Hill's life, could not be remedied through an action for monetary damages. Hill does not explain how an action for monetary damages would address these significant interests. In short, DOC's interests in maintaining an orderly correctional institution and preserving Hill's life warrant the grant of injunctive relief here.

Second, regarding Hill's contention that DOC's proper remedy is an action under the MHPA, we note: "The [MHPA] governs the provision of inpatient psychiatric treatment and involuntary outpatient treatment." *Commonwealth v. Sam,* 597 Pa. 523, 555, 952 A.2d 565, 584 (2008) (quoting *Zane v. Friends Hosp.,* 575 Pa. 236, 250, 836 A.2d 25, 33 (2003)). The purpose of the MHPA is "to assure the availability of adequate treatment to persons who are mentally ill, and to establish procedures to effectuate this purpose." *Id.*

Before the trial court here, Hill presented no evidence to establish he was mentally ill or otherwise subject to the MHPA. Further, in its brief, DOC maintains it is without any evidence to suggest the MHPA is applicable to Hill. Appellee's Br. at 7. As such, we reject Hill's argument that the MHPA provided DOC with an adequate remedy at law here.

In sum, we conclude that DOC did not present sufficient evidence that Hill's life was in imminent danger absent involuntary nutrition and hydration. DOC did,

however, present evidence that, at the time of the hearing, Hill refused opportunities for water and refused to allow medical staff to monitor his vital signs and weight, which created a significant health risk. Therefore, we modify the trial court's order so as to authorize DOC to involuntarily examine and perform invasive diagnostic tests on Hill including blood and urine tests. The trial court may proceed to the permanent injunction stage at a time when additional information regarding Hill's condition becomes available and warrants further relief. Also, as occurred here, DOC may seek an *ex parte* special injunction based on a medical affidavit averring risk of "imminent irreversible harm to [Hill's] body." C.R., Item # 1. Thus, we affirm as modified.

### ORDER

**AND NOW,** this 7th day of April, 2010, the order of the Court of Common Pleas of Huntingdon County is **AFFIRMED as MODIFIED.** The Department of Corrections may involuntarily examine and perform invasive diagnostic tests including blood and urine tests on Dwayne Hill, but may not administer medical treatment including nutrition and hydration at this time.

Jurisdiction is relinquished.

### CONCURRING OPINION BY Judge McCULLOUGH.

I agree with the majority that the Department of Corrections (DOC) may involuntarily examine and test Dwayne Hill and that DOC failed to present sufficient evidence to justify the involuntary adminis-
tration of nutrition and hydration. However, force feeding an inmate is a grave matter that raises substantial legal, ethical, and medical questions, which are not addressed by the majority opinion or developed by the parties in this appeal. Because the issue of involuntary feeding may return at the permanent injunction stage or in a proceeding involving an *ex parte* special injunction (majority op. at 940), I write separately to address my concerns.

I begin with a discussion of the medical procedures utilized to feed an inmate against his or her will.[1] A common method is nasogastric feeding, which is performed by inserting a tube through the nose, into the esophagus, and directly into the stomach. Peter Wood, Comment, *The Right to Refuse Medical Treatment: Courts Disparate Treatment of Incarcerated Patients,* 112 Penn. St. L. Rev. 1167 (2008). As the following examples demonstrate, this method has, at times, been performed in an inhumane manner, causing pain and harm to the prisoner.

In the case of *In re Caulk,* 125 N.H. 226, 480 A.2d 93 (1984), the dissenting opinion contains this account of the procedure:

> Mr. Caulk states in his brief that nasogastric tube-feeding began on June 1, 1984, in accordance with the May 25, 1984, preliminary order of the superior court. No novocaine was used during the insertion of the tube. He suffered a great deal of pain and discomfort as a result of the constant irritation of the tube on his throat and nasal passages. His efforts to resist the painful swallowing reflex caused him to suffer severe headaches. The tube was removed due

---

1. The complaint and application for a preliminary injunction state that DOC was seeking authorization to administer nutrition and hydration "intravenously *or otherwise,*" as may be deemed necessary by DOC, to preserve Hill's health and life. (Record item 1, Complaint at 3 and Application for *Ex Parte* Preliminary Injunction at 2) (emphasis added). DOC did not present any evidence in the trial court proceedings describing the precise procedure it intended to use to feed Hill.

to the danger of imminent ulceration of his throat and nasal passages.

*Id.* at 99 (Douglas, J., dissenting). In *In re Soliman*, 134 F.Supp.2d 1238 (N.D.Ala. 2001), *vacated as moot*, 296 F.3d 1237 (11th Cir.2002), the court recounted the following:

> [M]edical personnel initially inserted a large tube into his nose, which did not fit. The medical personnel then attempted to insert smaller and smaller tubes until Soliman's nose began bleeding internally. The doctor ordered that Soliman be injected with an anesthetic, and a gastric tube inserted through his mouth.

*Id.* at 1245.

A prisoner who undergoes the nasogastric feeding procedure may be restrained for long periods of time. In *Walker v. Horn*, 385 F.3d 321 (3rd Cir.2004), a Pennsylvania case, the prisoner stated that he was placed in restraints that immobilized his ankles, wrists, head, and chest for a protracted period of time, and that the feeding tube was kept in place for two days.[2] A similar scenario was reported in *McNabb v. Department of Corrections*, 163 Wash.2d 393, 180 P.3d 1257 (2008), where the prisoner was continuously strapped to a chair for twenty-eight hours and force fed by a tube through his nose. During the procedure the prisoner was unable to sleep and suffered medical complications from the procedure such as bleeding from the nose, pain, and nausea.

A second method of involuntary feeding is the use of a needle inserted into a blood vessel. While this procedure is less harsh and invasive than nasogastric feeding, intravenous feeding is difficult to perform on an inmate who is not sedated and carries a risk of blood loss and infection. Wood, *supra*, at 1181.

Force feeding a prisoner creates an ethical dilemma for medical professionals. The World Medical Association, of which the American Medical Association is a member, has articulated a policy that proscribes the force feeding of hunger striking prisoners. *McNabb*, (Sanders, J. dissenting). The World Medical Association issued this specific guideline:

> Where a prisoner refuses nourishment and is considered by the physician as capable of forming an unimpaired and rational judgment concerning the consequences of such a voluntary refusal of nourishment, he or she shall not be fed artificially. The decision as to the capacity of the prisoner to form such a judgment should be confirmed by at least one other independent physician. The consequences of the refusal of nourishment shall be explained by the physician to the prisoner.

Paragraph 6, World Medical Association, Declaration of Tokyo, revised May, 2006.[3] This principle was amplified by the Declaration of Malta, which provides as follows:

> Even if intended to benefit, feeding accompanied by threats, coercion, force or use of physical restraints is a form of inhuman and degrading treatment.

Paragraph 21, World Medical Association, Declaration of Malta on Hunger Strikers, revised October, 2006.[4] Of course, these

---

**2.** The prisoner in *Walker* claimed that the medical staff merely liquefied the regular prison meals—liver and mashed potatoes—and placed them in the feeding tube. He also claimed that he told prison officials while being restrained that he was willing to stop his hunger strike, but the officials informed him that his concession was too late and continued with the force feeding procedure.

**3.** http://www.wma.net/en/30publications/10 policies/c18/index.html.

**4.** http://www.wma.net/en/30publications/10 policies/h31/index.html.

are not binding rules, but they do offer insight into the ethical concerns of the medical profession on this difficult subject.

Despite the foregoing, I am not suggesting that involuntary feeding and hydration should never be ordered or that a prisoner has an unfettered right to refuse to eat. The case law demonstrates that there are valid, competing state interests involving the integrity of the prison system and the need to protect the life of the prisoner. However, to facilitate judicial review and balance the interests of the prisoner and the Commonwealth, I believe that DOC should develop (or incorporate into any such existing policy) a policy on hunger strikes and the involuntary feeding of prisoners that addresses the concerns expressed in this opinion.[5] Although such a policy is an administrative matter within the purview of DOC, I suggest that it include the following elements: (1) objective standards to determine when a prisoner is in imminent risk of irreversible harm to his or her body; (2) a requirement to develop a factual record in each case to explain how the prisoner's refusal to eat impacts on the orderly administration and security of the prison system; and (3) restrictions on the amount of time a prisoner may be restrained for the procedure.[6] The possibility of abuse could be further reduced by the addition of guidelines, such as: (1) in the event that force feeding is ordered, the feeding must be performed in a hospital by a licensed physician, if the physician concludes that it is required; (2)

the physician who performs the procedure must take all reasonable steps to minimize the prisoner's pain, discomfort, and the risk of harm; and (3) if the prisoner agrees to eat, the force feeding procedure must be immediately terminated.

It is unfortunate that this issue came before us by way of *pro se* appeal. If it returns in the future, I hope that we have the opportunity to delve deeper into this issue.

---

**5.** The certified record does not contain any DOC policies pertaining to hunger strikes and/or force feeding prisoners, and there is no testimony in the transcript that identifies or explains any of DOC's policies. Nevertheless, my research reveals that DOC published a policy on its website, Policy DC–ADM 13.01.01, which establishes detailed procedures for the observation and medical/psychological assessment of inmates who refuse to eat. While it is not clear whether this is the

current policy or the only policy governing these issues, I considered DC–ADM 13.01.01 when drafting the policy suggestions in this opinion. http://www.cor.state.pa.us/portal/server.pt/community/department_of_corrections/4604/doc_policies/612830.

**6.** DOC may restrain a prisoner when directed to do so by a doctor. 37 Pa.Code § 91.6(4); policy DC–ADM 201.